No. 52,651

STATE OF KANSAS, *Appellant,* v. MICHAEL STRECKER, *Appellee.*

(641 P.2d 379)

Opinion filed February 27, 1982.

*Steven R. Tatum,* assistant district attorney, argued the cause and *Robert T. Stephan,* attorney general, and *Dennis W. Moore,* district attorney, were with him on the brief for the appellant.

*J. Roy Holliday, Jr.,* of Speer, Austin, Holliday, Lane & Ruddick, of Olathe, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

HERD, J.: This is an interlocutory appeal by the State of Kansas in a criminal action where the appellee is charged with aggravated robbery (K.S.A. 21-3427). The trial court suppressed the evidence in question and quashed an in-court identification of the appellee. On appeal the Court of Appeals affirmed and review was granted.

On June 7, 1980, at approximately 11:00 p.m., Aubin's Retail Liquor Store and Aubin's Pop Shoppe were robbed by two young white persons, one male, the other female. They brandished knives to effect the robbery. Joe Jordan was the clerk in both establishments at the time of the robbery. Also present in the store during the robbery were Dick Aubin, Mike Dyche and Mike Cloughley.

The male assailant grabbed Joe Jordan from the rear, held a long-bladed chef's knife to his throat and demanded money. The female kept admonishing the witnesses that her co-felon meant business. The two obtained cash and checks from the cash register in the Pop Shoppe, then proceeded to walk Jordan next door to the liquor store and took the money from that cash register. After removing a phone piece the culprits ran from the premises, chased by Aubin and Dyche. During the chase Aubin threw a pop bottle at the fleeing robbers and fell down in the process. The

male culprit returned and slashed Aubin on the thumb with the chef's knife. Dyche terminated his pursuit to render assistance to Aubin. The robbers escaped.

The witnesses described the male robber as being approximately 5'9" to 5'10" tall, slightly built, with pale complexion and brown curly hair parted in the middle. The male had a scarf around his face covering halfway up the nose but open to the corner of the mouth, showing the robber was clean-shaven. He was clad in green khaki-corduroy overalls with a lumberjack shirt. He had a "very deep accent." The robbers were under observation of the witnesses for from eight to ten minutes, covering the robbery and the chase afterward.

The female was described as 5'9" tall, with sandy hair and chunky build, weighing 150 pounds. She was clad in bib overalls with a red lumberjack shirt and white perforated cowboy hat.

On June 13, 1980, Officer Gary Emerson, a policeman from Roeland Park, observed two persons at the back of a liquor store in Fairway who fit the description of the culprits of the previous robbery. He requested identification from them and was informed they were Michael Strecker and Annelene Toenges, West German nationals, present in the United States on work visas. They gave their address as 2910 W. 43rd, apartment A, Kansas City. Officer Emerson, the initial investigating officer of the robbery, noted the address given was approximately one mile north of the liquor store and in the direction the robbers ran as they escaped.

On June 17, 1980, at approximately 8:45 p.m. Detective Stuart Doyle and four other officers went to 2910 W. 43rd, apartment A, to follow up the report made by Officer Emerson. The mailbox to the apartment listed Brian Huggins, Barbara Huggins, David Huggins, Michael Strecker, Gobbie Strecker and Annelene Toenges as residents. Barbara stated she rented the apartment and was responsible for complying with the lease. She said she and her husband, Brian, were getting a divorce and he had moved out. Ms. Huggins testified appellee had been living with her for approximately one month. Strecker stayed in the Huggins' son's bedroom. Ms. Huggins later testified he had the room "all to himself."

There is a conflict of testimony concerning the search and seizure which will be examined in more detail during the dis-

cussion of the issue. It is clear the four or five officers searched the apartment and Detective Doyle found a chef's knife on the top shelf of the closet in the bedroom occupied by Barbara Huggins, Gobbie Strecker and Annelene Toenges. Ms. Huggins testified the knife belonged to her and she had placed it in the closet out of reach of her son.

The search also produced Strecker's passport containing the usual photograph. Officers took both the knife and the photograph to the station with them for evidentiary purposes. The evidence here is also conflicting and will be discussed in more detail later.

Appellee was apprehended, arrested and bound over for trial. He then filed a motion to suppress the evidence seized from the Huggins' apartment and to quash any in-court identification of him because of the illegal search and seizure. The trial court sustained the motion and this interlocutory appeal followed. The Court of Appeals affirmed and we granted review.

Appellant raises three issues on appeal: (1) Whether the trial court erred in finding appellee had "standing" to contest the legality of the search of his sister's bedroom; (2) whether the trial court erred in finding Barbara Huggins did not give informed consent to the search of her apartment; (3) whether the trial court erred in quashing the in-court identification of appellee by reason of the seized passport photo.

Even though it appears there was nothing to prevent the police from obtaining a search warrant and consequently avoiding the succeeding problems, the apartment was searched without a warrant. Subject to a "few specifically established and well-delineated exceptions," searches and seizures without a warrant are unreasonable. *Coolidge v. New Hampshire,* 403 U.S. 443, 454-55, 29 L.Ed.2d 564, 91 S.Ct. 2022 *reh. denied* 404 U.S. 874 (1971), quoting *Boyd v. United States,* 116 U.S. 616, 635, 29 L.Ed. 746, 6 S.Ct. 524 (1886). One of the most often recognized of those exceptions is consent. See *e.g., Zap v. United States,* 328 U.S. 624, 629, 90 L.Ed. 1477, 66 S.Ct. 1277 (1946), *vacated on reh. on other grounds* 330 U.S. 800 (1947); *State v. Jakeway,* 221 Kan. 142, Syl. ¶ 4, 558 P.2d 113 (1976). If Barbara Huggins consented to the search of her apartment and her room the search was proper and the remaining issues are of no import. Let us first examine the question of consent. Detective Doyle and Officer

Milan testified at the August 20, 1980, suppression hearing they went to the Huggins apartment on June 17 with three other officers. All were in uniform except Detective Doyle. Officer E. J. Milan testified as follows concerning entry to the apartment.

"Q. [By Mr. Tatum] Who answered the door?
A. Barbara Huggins did.

. . . .

Q. What did you do when you first arrived there?
A. We knocked at the door at which time she answered the door. She then asked us to step inside.
Q. Did you enter?
A. We did.
Q. What happened then?
A. We then asked her if Michael and Annelene were at home.
Q. What did she tell you?
A. She told us that Michael had gone to a picnic and she thought Annelene had gone to the Plaza Shopping Center.
Q. What did you do then?
A. Then asked her if she had any photographs of Michael and Annelene.
Q. What did she tell you?
A. She told us she did and she removed two passports from her purse.
Q. Did she show you one that belonged to Michael Strecker?
A. Yes, she did.

. . . .

Q. What else did you do at the residence on the 17th of June, 1980, after you received the passport?
A. We asked Barbara if the apartment was rented in her name.
Q. What did she tell you?
A. To which she replied, Yes, it was. We then asked her if it would be permissible to look around.
Q. What did she tell you?
A. To which she gave her consent.

. . . .

A. She said, Yes, it would be alright."

On cross-examination of Officer Milan the following testimony was elicited:

"Q. [By Mr, Holliday] Did you explain to her what you were doing there?
A. Yes, sir.
Q. What did you tell her?
A. That we wished to speak to Michael and Annelene in reference to an armed robbery.

. . . .

Q. Is it your testimony that Officer Doyle asked her if she had any photographs of Michael Strecker?
A. No, sir, I believe I asked her.
Q. What was her response?

A. She responded by saying that yes, she did.
Q. Did you ask her if you could see them?
A. Yes, I did.

. . . .

A. I asked her if I could hold the passports in my possession.
Q. And what was her response?
A. She said yes."

Detective Doyle testified as follows concerning the search and seizure:

"Q. [By Mr. Tatum] Did you accompany Sergeant Milan to the apartment of Barbara Huggins on that date?
A. Yes, I did.
Q. Did you enter into the residence at approximately the same time Sergeant Milan entered?
A. Approximately, yes.
Q. Did you have occasion to look around that apartment?
A. After I gained permission to search, yes."

An objection was sustained and the interrogation continued:

"Q. [By Mr. Tatum] Describe how consent was obtained, please.

. . . .

A. I know I asked her if I could look around the apartment. Now, I don't know if Sergeant Milan also asked her is what I mean, okay?
Q. [By Mr. Tatum] Okay. Did she give her consent?
A. Yes, she did.
Q. Did you look around the apartment?
A. Yes, I did.

. . . .

Q. At the time that you came to the apartment did she appear frightened or nervous by your presence there?
A. Not for her own welfare. She was worried why we wanted her brother.
Q. Did she appear to you to be cooperative throughout?
A. Yes. We would talk to her about what we were doing, why we were there. She seemed to understand what we were attempting to do.
Q. What did you tell her was the reason that you were there?
A. That we were investigating a robbery of a liquor store."

On cross-examination Detective Doyle stated:

"Q. [By Mr. Holliday] What did you say to her when she answered the door?
A. We wanted to see or talk to Michael Strecker.
Q. Didn't she tell you he wasn't home?
A. Yes.
Q. Did you tell her then what you wanted from her or what you hoped to accomplish there?
A. Yes.
Q. What did you tell her?
A. We explained to her why we were there.

Q. Would you tell me what you told her, please?
A. That we were working an armed robbery and that we suspected that Mike might be involved.
Q. Did you tell her that you wanted to go through her home to take items that might be used in evidence against him?
A. No. We told her we wanted to search the apartment.

. . . .

Q. When you initially spoke with her did you explain to her that she didn't have to let you in, she could tell you to go away and shut the door?
A. I don't think I've ever told that to anybody. I did explain to her that she had the right to refuse to let us search.
Q. When?
A. Before — when we asked to look around. I said, 'You don't have to let us look around, but will you?' "

Barbara Huggins was called as a witness for Michael Strecker. She testified she gave no one permission to enter her apartment. On cross-examination the following occurred:

"Q. [By Mr. Tatum] You didn't have anything to hide there at the house, did you?
A. No, If I would have I wouldn't let them in."

Later on cross-examination of Ms. Huggins the following colloquy occurred:

"Q. [By Mr. Tatum] Would you say you were trying to be cooperative with the police in clearing this matter up?
A. I was trying to find out what the trouble was, what the problem was, what was going on in this whole thing. I gave the police every information I had at the time.
Q. When they told you that it was regarding a possible robbery you wanted to cooperate or help clear it up, is that right?
A. Yes, because I can't believe my brother would be involved in an armed robbery. I kept telling them that, too."

Officer E. J. Milan stated in his report, which was made immediately following the events of June 17 and prior to the filing of the motion to suppress:

"The officers were asked by Ms. Huggins to step inside of the residence. . . . Ms. Huggins was asked if she had any photos of Michael and Annelene. Ms. Huggins removed from her purse passports belonging to Michael Strecker and Annelene Toenges. Detective Doyle then asked Ms. Huggins if the apartment was rented in her name. She replied yes. Detective Doyle then asked the subject Barbara if he could look around the apartment with her consent, to which she replied yes. Detective Doyle then advised r/o to come to one of the bedrooms where he showed r/o a long Chef's knife which he advised that he located on the top shelf in a closet. Officers then asked Barbara whose knife the article was, to which she replied it was her brother's and further advised that her

brother was employed as a cook while in West Germany. Officers then asked Barbara if we could take the knife to which she replied yes. The r/o took custody of the knife. Detective Doyle then asked subject Barbara if she would accompany him to the Roeland Park Police Department to talk to him about the possibility of her brother being involved in an armed robbery. Barbara asked if she was under arrest. She was advised that she was not under arrest and if she decided to accompany Detective Doyle, it would be voluntary. Barbara advised that she would talk to Detective Doyle."

Detective Doyle also made a report on June 18th, the day following the search of the Huggins apartment, in which he stated:

"Ms. Huggins who is in the process of getting a divorce was asked if a search of her apartment could be made. She advised that it could."

If a trial court's findings on a motion to suppress evidence are supported by substantial evidence they will not be disturbed on appeal. *State v. Nicholson,* 225 Kan. 418, 423, 590 P.2d 1069 (1979); *State v. Johnson,* 223 Kan. 185, 187, 573 P.2d 595 (1977); *State v. Youngblood,* 220 Kan. 782, Syl. ¶ 2, 556 P.2d 195 (1976). The existence and voluntariness of a consent to search and seizure is a question of fact to be decided in the light of all attendant circumstances by the trier of facts and will not be overturned on appeal unless clearly erroneous. *State v. Nicholson,* 225 Kan. at 423; *State v. Buckner,* 223 Kan. 138, 144, 574 P.2d 918 (1977); *State v. Jakeway,* 221 Kan. 142, Syl. ¶ 6. The quantum of evidence necessary to prove voluntariness of consent has been held to be by a preponderance. *State v. Buckner,* 223 Kan. 138, Syl. ¶ 2.

In summary, the foregoing rules of law demonstrate that if the State shows by a preponderance of evidence the consent was voluntary, a finding of involuntariness would be erroneous and unsupported by substantial evidence.

Here, Officer Milan and Detective Doyle testified Barbara Huggins invited them into her house and advised them they could look around. Doyle said he asked if they could search. They testified Ms. Huggins voluntarily went to the police station with them for an interview and signed a receipt releasing the evidence to them. The two written reports made by the officers the day following the search and before a motion to suppress was filed corroborate the voluntariness of the consent to search and seizure.

All of the officers except Doyle were in uniform. They advised Ms. Huggins they were looking for her brother in connection

with a liquor store robbery. The nature and implications of their investigation were fully revealed to her. She demonstrated she understood what was involved. When asked:

"When they told you that it was regarding a possible robbery you wanted to cooperate or help clear it up, is that right?"

She answered:

"Yes, because I can't believe my brother would be involved in an armed robbery. I kept telling them that, too."

There can be no question the State showed by a preponderance of the evidence Ms. Huggins gave consent. The trial court so found and its finding is supported by substantial, competent evidence and will therefore not be disturbed on appeal. However, the trial court also found the consent so given was not informed. With that finding we disagree because it was not supported by the evidence. Viewing the episode in its totality—the appearance of the police in uniform; their uncontroverted request for permission to look around; the acknowledged statement of the police to Ms. Huggins they were looking for her brother, a robbery suspect; and Ms. Huggins' admissions on cross-examination—leave the claim she was uninformed when she gave consent unsupported by substantial competent evidence. The trial court's order suppressing the evidence is therefore erroneous and is reversed. In view of the foregoing the other issues on appeal need not be addressed.

The judgment of the trial court is reversed.