No. 54,049

STATE OF KANSAS, *Appellee,* v. MARION LEWIS LOCKETT, *Appellant.*

(654 P.2d 433)

Opinion filed December 3, 1982.

*James E. Rumsey,* of Rumsey & Hooge, of Lawrence, argued the cause and was on the brief for the appellant.

*Craig Stancliffe,* assistant district attorney, argued the cause, and *Robert T. Stephan,* attorney general, and *Michael J. Malone,* district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

HERD, J.: This is a direct appeal from a jury conviction of aggravated robbery. K.S.A. 21-3427.

During the early evening hours of Thursday, July 30, 1981, a lone black man entered the Burns Retail Liquor Store at 1917 West 24th Street in Lawrence. After threatening to stab the owner with a serrated steak knife, the robber fled with the day's receipts in a quart liquor sack.

Officer Severeno Woods was called to the scene of the robbery. Mr. Burns provided a description of the robber. As the result of a conversation with a Ms. Rafferty, the former manager of some nearby apartments, Officer Woods determined Yuseph Chaka was a suspect in the Burns Liquor robbery. Woods and two other officers went to Chaka's residence at 1733 West 24th later that evening. After knocking on the door a woman inside advised them Chaka no longer lived there.

Just after midnight on Sunday, August 2, 1981, the Taco Tico restaurant one-half block away from Burns Liquor Store was robbed at gunpoint. This time the thief had a pillowcase over his

head and was wearing a shirt of distinctive color and design. A Taco Tico employee remembered the shirt was similar to one worn by a black man who had been in the restaurant earlier to order food. The robber left with the money in an orange plastic water pitcher.

Officer Woods was also on duty when the Taco Tico was robbed. The Taco Tico robber had the same height and weight characteristics as the person who hit nearby Burns Liquor two nights earlier. Woods, of course, again thought of Mr. Chaka. He advised other officers the Taco Tico suspect might live at 1733 West 24th, the address Woods had checked for Chaka on July 30.

After Woods' tip, officers converged on the apartment at 1733 West 24th. Appellant Marion Lockett and Larry Fowler were in the apartment. Officers knocked on the door and Lockett admitted them. They inquired of his name and birthdate. Realizing Lockett was not Yuseph Chaka the officers went outside and ran Lockett's name through the National Crime Information Center computer. The computer revealed there was an outstanding warrant for forgery on Lockett. Officers returned and arrested Lockett. Incident to the arrest officers seized appellant's shirt and a Taco Tico bag lying on the coffee table. A search turned up nothing else related to the Taco Tico robbery.

On August 3, 1981, Detective Michael Hall, who had been assigned to investigate the Burns Liquor robbery, interviewed Virginia Steele. Ms. Steele lived a block from the appellant's apartment. She stated that during the early evening on Thursday, July 30, 1981, the appellant came to her residence and told her he had just robbed a nearby liquor store. Ms. Steele also stated that during the time appellant was at her apartment he had a knife in his hand.

Hall also talked to Jay Johnson on August 3. Johnson stated he took the appellant to Kansas City on the evening of July 30, 1981, and the appellant appeared to have an unusually large amount of money.

Hall took this information to Assistant District Attorney Craig Stancliffe who prepared an affidavit for a warrant to search the appellant's apartment. The affidavit generally recounted the circumstances surrounding the two robberies and Lockett's arrest. It also related the story told by Virginia Steele. No mention, however, was made of the search which occurred incident to Lockett's

arrest. A warrant was issued on August 4, 1981. A search the same day uncovered a quart liquor sack in a bedroom wastebasket and a serrated steak knife from atop a bedroom dresser.

Lockett was charged with aggravated robbery (K.S.A. 21-3427) of the Burns Liquor Store. A pretrial motion to suppress the evidence recovered in the August 4 search of his apartment was overruled. Lockett was convicted by a jury. He appeals.

Appellant first claims the affidavit for search warrant was insufficient because it did not mention (1) Burns could not identify Marion Lockett's picture in a photo lineup conducted August 3, 1981, and (2) the August 2 search of Lockett's apartment turned up nothing.

The scope of review of a suppression hearing is limited. "If a trial court's findings on a motion to suppress evidence are supported by substantial evidence they will not be disturbed on appeal." *State v. Strecker,* 230 Kan. 602, 608, 641 P.2d 379 (1982); *State v. Nicholson,* 225 Kan. 418, 423, 590 P.2d 1069 (1979).

In *State v. Jacques,* 225 Kan. 38, 43-44, 587 P.2d 861 (1978), this court, relying on *Franks v. Delaware,* 438 U.S. 154, 57 L.Ed.2d 667, 98 S.Ct. 2674 (1978), stated the general rules applicable to this case:

"However, there is a presumption of validity with respect to an affidavit supporting a search warrant and generally a party against whom a search warrant is directed may not dispute the matters alleged in the supporting affidavit or application. [Citation omitted.]

"An exception to the above general rule is recognized if the challenger's attack is supported by allegations and an offer of proof under oath that the affidavit or application for search warrant contains material statements of deliberate falsehood or of reckless disregard for the truth. Under this exception an evidentiary hearing would be required on a motion to suppress evidence obtained in the search. The challenger has a duty to point out specifically the portion of the warrant affidavit that is claimed to be false, and a statement of supporting reasons should accompany the motion to suppress."

Obviously the *Jacques* case applied only to false statements contained in an affidavit for search warrant. However, a deliberate omission is often equal to an actual misstatement. Thus, the *Jacques* and *Franks* rules can easily apply to a case where a person claims authorities deliberately omitted material information from a search warrant.

*Jacques* requires that the person attacking the affidavit show two things: (1) the omission was deliberate, and (2) the omission was material.

First there is no direct evidence the omission of either the lineup or search was deliberate. However, even if the omission were deliberate it must also be material. In other words, if the issuing judge had the omitted information before him when he examined the affidavit, would a finding of probable cause to issue a search warrant still have been proper?

"Probable cause" to issue a search warrant is not easily defined. This court has, however, compared it to a jigsaw puzzle where, "[b]its and pieces of information are fitted together until a picture is formed which leads a reasonably prudent person to believe a crime has been or is being committed and that evidence of the crime may be found on a particular person or in a place or means of conveyance." *State v. Morgan,* 222 Kan. 149, 151, 563 P.2d 1056 (1977). In any event, probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction. *State v. Weigel,* 228 Kan. 194, 197, 612 P.2d 636 (1980); *State v. Marks,* 231 Kan. 645, 647-48, 647 P.2d 1292 (1982).

We conclude the omission of the information regarding the lineup was immaterial. Even if the information had been included in the affidavit, probable cause would have still existed based on the information received from Virginia Steele and Jay Johnson.

Whether probable cause would have existed had information regarding the August 2 search of Lockett's apartment been included on the affidavit presents a more difficult question. This determination depends on what the searching officers were looking for during the August 2 search. If the officers searched for a serrated knife and a quart liquor sack on August 2 without success there is no reason to believe those items would be at Lockett's apartment on August 4.

Officers Gist, Love, Greer and Othick stayed at Lockett's apartment after his arrest August 2. Officer Gist remained outside. Officer Othick spent most of his time in the kitchen with Larry Fowler, although he did state he "went through" the apartment looking for evidence of the Taco Tico robbery. Officer Love indicated she searched for "a gun, a pillowcase, money and a pitcher." Love stated she knew about the Burns Liquor Store robbery but not the steak knife. Officer Greer testified he was looking for evidence of the Taco Tico robbery. He stated he saw

several knives but that since he was not looking for a steak knife he paid little attention to them.

The officers' testimony demonstrates there is substantial evidence the August 2 search was not material to the search warrant issued August 4 authorizing police to search the apartment and seize the liquor sack and steak knife. The officers on the premises August 2 knew little about the Burns Liquor robbery. They were searching for evidence of the Taco Tico crime, not the steak knife and liquor sack. Thus, even had the omitted information been included in the affidavit there would have remained probable cause to issue the warrant.

Appellant also challenges the trial court's limitation of his examination of prospective jurors. During voir dire the following exchange took place:

"MR. RUMSEY: When you came into the courtroom and you sat down and you realized that this was a criminal case, how did you feel?

"JUROR WEBB: Oh, I can't really say I had any indirect feelings. I have some definite feelings about criminals.

"MR. RUMSEY: What are those feelings?

"THE COURT: I don't think that it is necessary that you tell us — I don't think it is necessary that you ask that, counsel, what his feelings are about criminals. I think it is important to determine whether or not you feel that your feelings one way or the other would in any way influence your decision in this case and not be bound by the evidence and instructions given by the Court. That is the only issue. I don't want this to turn into a session of each person telling what their feelings are concerning criminals or crime. Keeping that in mind, you may proceed.

"MR. RUMSEY: Frankly, Your Honor, that is what I wanted to inquire about of the jurors, to see how they do feel about crime.

"THE COURT: You may stay within my parameters, counsel."

Appellant complains the court's ruling prevented him from asking "open-ended" questions, thus denying him the opportunity to explore the prospective jurors' individual feelings about crime and criminals.

Let us examine the voir dire issue. The landmark Kansas case involving counsel's questioning of prospective jurors is *Swift v. Platte,* 68 Kan. 1, 6-8, 72 Pac. 271, *rev'd on rehearing* 68 Kan. 10, 74 Pac. 635 (1903). The issue there involved questions by plaintiff's counsel which suggested the defendant had insurance. The court thoroughly discussed the voir dire process:

"Considerable latitude should be allowed counsel in the examination of jurors, so that all who have bias or prejudice, or are otherwise disqualified, may be eliminated but the inquiry should never be made to introduce extraneous matter

of a prejudicial character that may improperly influence the verdict. Questions are not to be barred merely because the answers elicited would be incompetent under the issues in the case; nor are the parties to be hampered in a thorough examination, made in good faith, to keep off the panel partial, prejudiced and unfit men. The inquiry may be extended to the social and business relations of the proposed jurors with the parties to the action or with any one connected with the litigation. It should, however, as before stated, be conducted in good faith, by pertinent inquiries, for the purpose of sifting the panel and excluding those who are disqualified or objectionable by challenges peremptory or for cause.

". . . .The scope of a *voir dire* examination must be left largely to the sound discretion of the trial court. There is no more important feature of a trial than the impaneling of an impartial and unbiased jury, and courts are very liberal in allowing inquiries into the competency and qualifications of persons called as jurors. The examination serves a double purpose — first, to learn whether there is a disqualification or cause for challenge, and, second, to enable a party to determine whether he shall exercise the right of peremptory challenge given by statute. So careful is the law that a fair jury may be obtained that it not only provides for the exclusion of those shown to be partial or prejudiced, but it gives each party the added right to challenge a certain number not shown to be prejudiced or disqualified, whom the parties may desire to exclude for reasons not recognized by the law. Apart from admitted bias or prejudice, persons may be excluded from the panel because of possible prejudice on account of pecuniary interest, relationship, or business connection with the parties to the action. They may be excluded because of relationship or connection with the families or attorneys of the parties, or with others who have an interest in the litigation. If the parties to the case are nominal or representative the relation or connection with the real parties to the action may be shown, and be sufficient cause for challenge and exclusion."

Almost 60 years later, in a case involving the same issues, the court repeated much of what had been said in *Swift v. Platte.* In *Mathena v. Burchett,* 189 Kan. 350, 355, 369 P.2d 487 (1962), however, the court added the following, indicating the modern trend of relying more and more on the trial court's discretion:

"The extent to which counsel should be allowed to go in examining jurors as to their qualifications cannot be governed by any fixed rules. The examination is conducted under the supervision and direction of the trial court, and the nature and extent of the examination and what questions may or may not be answered must necessarily be left largely to the sound discretion of the trial court, the exercise of which will not be interfered with unless clearly abused. [Citation omitted.] It is elemental that the scope must be regulated by the purpose of such examination, that purpose being whether the prospective juror has both the statutory qualification of a juror and is free from bias or prejudice for or against either litigant. Both parties are entitled to an impartial jury, and a fair and impartial trial is the birthright of every litigant. The examination of the jury should neither be overly liberalized nor should it be unduly restricted."

In criminal cases the same rules have been applied with less theoretical discussion. The hallmark of this court's resolution of voir dire issues in criminal cases had been its deference to the discretion of the trial court. This rule has been repeated often and has taken many forms. For example, in *State v. Welch,* 121 Kan. 369, 247 Pac. 1053 (1926), the court recognized that the trial court had authority to control the examination of jurors in order to speed up the process. The court also has discretion in deciding whether a question asked during voir dire is improper because it has nothing to do with anything concerning the jury. In *State v. Lovell,* 127 Kan. 157, 272 Pac. 666 (1928), the court upheld the trial court's refusal to permit defense counsel to read to prospective jurors the statutory penalty for selling morphine. In *State v. Andrews,* 187 Kan. 458, 357 P.2d 739 (1960), *cert. denied* 368 U.S. 868 (1961), the court refused to allow defense counsel to advise jurors the defendant would go to a mental hospital if he was found not guilty by reason of insanity. Finally, in *State v. Reed,* 214 Kan. 562, 520 P.2d 1314 (1974), and *State v. Osbey,* 213 Kan. 564, 517 P.2d 141 (1973), the court held questions by defense counsel concerning premeditation and intent were improper in a prosecution for felony murder.

Also important with regard to voir dire are whether the questions prejudiced the defendant's right to a fair trial, *State v. Latham & York,* 190 Kan. 411, 375 P.2d 788 (1962), *cert. denied* 373 U.S. 919 (1963), and whether the questions amounted to a comment on the defendant's right against self-incrimination. *State v. Phippen,* 208 Kan. 962, 494 P.2d 1137 (1972).

The Kansas case in point to the one at bar is *State v. Darling,* 208 Kan. 469, 475, 493 P.2d 216 (1972). There the defendant was convicted of procuring an abortion. Defense counsel attempted to "question the veniremen as to whether or not they had 'any moral scruples or any moral compunction' concerning abortions . . . ." The Supreme Court noted the discretionary power of the trial court in relation to voir dire. It then upheld the trial court's action, stating:

"The moral attitude of the veniremen as to the desirability or undesirability of abortions is immaterial. However, an attempt by counsel for the defendant in a criminal action to discover if there is any bias or prejudice against one charged with abortion on the jury panel should not be unduly restricted.

"While the trial court perhaps should have granted the appellant more leniency in this respect, on the record presented we cannot say the court abused the

exercise of its power of discretion in limiting the inquiry by the appellant. Here all veniremen were questioned on whether they had any preconceived ideas of what an abortion law should be like, or whether they would have any difficulty applying the law as given to them by the judge. All of the jurors answered these questions in the negative. Whether or not a juror can consider the case on the law as it exists without bias or prejudice is the material point here under attack.

"Considering the record in *voir dire* examination we cannot say the appellant was prejudiced by the trial court in curtailing *voir dire* examination of the jurors." 208 Kan. at 476.

In *State v. Trujillo,* 225 Kan. 320, 325, 590 P.2d 1027 (1979), the court stated, "[S]upervision over voir dire examination of the veniremen and control over the nature and extent of questioning are matters necessarily left to the sound discretion of the trial court." This court will not interfere unless an abuse of discretion is clearly shown. *State v. Osbey,* 213 Kan. at 569.

We conclude counsel must glean a venireman's philosophy from responses to questions asked which are relevant to the prospective juror's bias and prejudice in the case at issue. The scope of such inquiry falls within the sound discretion of the trial court.

Here the trial court was concerned about defense counsel asking "narrative questions," taking up too much time, and instructing the jurors as to what they should think through the use of his questions. The trial court did not restrict defense counsel's use of "open-ended" questions as such. Indeed, the record contains several examples of questions asked of prospective jurors which could be considered "open-ended" but were allowed by the trial court nonetheless. It was when the questions became too general or defense counsel began instructing prospective jurors through his questions that the trial court objected. Clearly, no abuse of discretion has been shown.

The judgment is affirmed.