(658 P.2d 1052)

No. 54,274

STATE OF KANSAS, *Appellant,* v. LARRY MZHICKTENO and DENNIS DINWIDDIE, *Appellees.*

Opinion filed February 24, 1983.

*Frank J. Yeoman, Jr.,* assistant district attorney, *Gene M. Olander,* district attorney, and *Robert T. Stephan,* attorney general, for appellant.

*Randy L. Baird,* of Ireland, Enright & Baird, of Topeka, for appellees.

Before FOTH, C.J., REES and SWINEHART, JJ.

REES, J.: Defendants are charged with burglary (K.S.A. 21-3715) and felony theft (K.S.A. 21-3701). The State appeals from a suppression order under K.S.A. 22-3215 and -3216.

Defendants were off-duty Topeka police officers when they purportedly committed the charged crimes. The appealed order suppresses defendants' incriminating statements given to officers of the Topeka Police Department internal affairs division in separate interrogations without *Miranda* warning.

A citizen gave Topeka police a written statement reporting possible criminal activity by the defendants. She reported defendants had taken furniture from vacant residential properties. The report precipitated police investigation specifically focused on, and only on, defendants. Investigatory contact with defendants was made by Topeka Police Department internal affairs division officers who met with and questioned Dinwiddie at the police station at the end of a duty shift and Mzhickteno at his residence when he was off duty.

At the meetings with the defendants, the internal affairs officers were accompanied by an assistant city attorney assigned as the police department legal adviser. Each defendant's interro-

gation was immediately preceded by an advisory statement by the assistant city attorney. He testified:

"I advised [Dinwiddie] that there had been some allegations made or some questions raised concerning his conduct that involved possible misconduct; that this was a Departmental matter. It involved an allegation of wrongdoing, in effect; that we needed to ask some questions of him. It was to be a purely administrative matter . . . ."

"I advised [Mzhickteno], as I had advised Officer Dinwiddie, that this was an Internal Affairs investigation. It was a strictly Departmental matter involving some rumors, some allegations of possible misconduct on his part, and that the Internal Affairs section wanted to ask him some questions."

As police officers, it was defendants' duty to answer the questions put to them by the interrogating internal affairs officers. Refusal to answer would subject the defendants to departmental discipline. While the record does not reveal defendants' refusal to answer would necessarily have resulted in their discharge, the Chief of Police directly testified the alternative to refusal was "some type of disciplinary measures." The question raised is whether the defendants' incriminating statements given under these circumstances are admissible in this criminal action. K.S.A. 22-3215. The case before us does not involve employee discharge or other disciplinary action by a public employer. Neither, is it a case where perjury is charged.

The State argues *Miranda* warnings were not required because the suppressed statements were not the product of *custodial* interrogation, that is, questioning while the person is held in legal custody or otherwise deprived of his freedom of action in any significant way. See *Miranda v. Arizona,* 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974 (1966); *State v. Costa,* 228 Kan. 308, 311, 613 P.2d 1359 (1980). The trial judge found the statements were inadmissible coerced statements but he did not order suppression on the ground they were the product of custodial interrogation without *Miranda* warning.

The assistant city attorney's statements to defendants can only be viewed as instruction and advice that the internal affairs officers' investigation was an in-house administrative investigation with the clear implication defendants were not the subject of criminal investigation. Under these represented circumstances, defendants' alternative to refusal to answer their interrogators' questions was disciplinary penalty.

*Garrity v. New Jersey,* 385 U.S. 493, 17 L.Ed.2d 562, 87 S.Ct. 616 (1967), held that incriminating statements made under threat

of removal from public office are coerced and inadmissible in subsequent criminal trial proceedings. The teaching of *Garrity* is particularly instructive. It merits the following extended quotation from the opinion of the court authored by Justice Douglas:

"Before being questioned, each appellant was warned (1) that anything he said might be used against him in any state criminal proceeding; (2) that he had the privilege to refuse to answer if the disclosure would tend to incriminate him; but (3) that if he refused to answer he would be subject to removal from office.

"Appellants answered the questions. No immunity was granted . . . . Over their objections, some of the answers given were used in subsequent prosecutions for conspiracy to obstruct the administration of the traffic laws. Appellants were convicted and their convictions were sustained over their protests that their statements were coerced . . . .

. . . . .

"The choice imposed on petitioners was one between self-incrimination or job forfeiture. Coercion that vitiates a confession under *Chambers v. Florida*, 309 U.S. 227, and related cases can be 'mental as well as physical'; 'the blood of the accused is not the only hallmark of an unconstitutional inquisition.' *Blackburn v. Alabama*, 361 U.S. 199, 206. Subtle pressures (*Leyra v. Denno*, 347 U.S. 556; *Haynes v. Washington*, 373 U.S. 503) may be as telling as coarse and vulgar ones. *The question is whether the accused was deprived of his 'free choice to admit, to deny, or to refuse to answer.'* *Lisenba v. California*, 314 U.S. 219, 241.

. . . . .

"The choice given petitioners was either to forfeit their jobs or to incriminate themselves. The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent. That practice, like interrogation practices we reviewed in *Miranda v. Arizona*, 384 U.S. 436, 464-465, is 'likely to exert such pressure upon an individual as to disable him from making a free and rational choice.' We think the statements were infected by the coercion inherent in this scheme of questioning and cannot be sustained as voluntary under our prior decisions.

"It is said that there was a 'waiver.' . . .

"Where the choice is 'between the rock and the whirlpool,' duress is inherent in deciding to 'waive' one or the other.

" 'It always is for the interest of a party under duress to choose the lesser of two evils. But the fact that a choice was made according to interest does not exclude duress. It is the characteristic of duress properly so called.' [*Union Pac. R. R. Co. v. Pub. Service Comm.*, 248 U.S. 67, 70, 63 L.Ed. 131, 39 S.Ct. 24 (1918).]

. . . . .

"Mr. Justice Holmes in *McAuliffe v. New Bedford*, 155 Mass. 216, 29 N.E. 517, stated a dictum . . .

" 'The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman. There are few employments for hire in which the servant does not agree to suspend his constitutional right of free speech, as well as of idleness, by the implied terms of his contract. The servant cannot complain, as he takes the employment on the terms which are

offered him. On the same principle, the city may impose any reasonable condition upon holding offices within its control.' [155 Mass.] at 220 . . . .

"The question in this case, however, is not cognizable in those terms. Our question is whether a State, contrary to the requirement of the Fourteenth Amendment, can use the threat of discharge to secure incriminatory evidence against an employee.

. . . .

"We conclude that policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights.

"There are rights of constitutional stature whose exercise a State may not condition by the exaction of a price. . . . We now hold the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic." (Emphasis added.) 385 U.S. at 494-500.

A particularly good exposition of *Garrity's* teaching and its applicability appears in *Moffett v. City of Portland,* 400 A.2d 340, 343-345 (Me. 1979). The reader's attention is invited to what is said there.

When the admission into evidence of a defendant's extrajudicial statement is challenged pursuant to a motion under K.S.A. 22-3215, the trial judge must conduct a hearing out of the presence of the jury to determine whether the statement is admissible as a hearsay exception (K.S.A. 60-460[f]). While the circumstances surrounding the making of the statement may be submitted to the jury as bearing upon the weight or credibility of the statement, the threshold issue of admissibility is for resolution by the trial judge. The State has the burden of proving admissibility. The ultimate issue to be decided, upon the totality of circumstances, is whether the statement was freely, voluntarily and intelligently made. *State v. Duncan,* 221 Kan. 714, 720, 562 P.2d 84 (1977); *State v. Kanive,* 221 Kan. 34, 35, 558 P.2d 1075 (1976). See also *State v. Baker,* 4 Kan. App. 2d 340, 342, 606 P.2d 120 (1980). When supported by substantial evidence, a trial court decision on a motion to suppress will not be disturbed on appeal. *State v. Strecker,* 230 Kan. 602, 608, 641 P.2d 379 (1982); *State v. Chiles,* 226 Kan. 140, 144-145, 595 P.2d 1130 (1979); *State v. Youngblood,* 220 Kan. 782, 785, 556 P.2d 195 (1976); *State v. Parks,* 5 Kan. App. 2d 644, 645, 623 P.2d 516 (1981).

Although *Garrity* involved removal from office as the alternative to refusal to answer and a specific warning of this conse-

quence, it remains that in the case before us the price of refusal to answer the internal affairs officers' questions was imposition of discipline by their public employer. Under these circumstances and the teaching of *Garrity,* we conclude the trial judge correctly held the statements were inadmissible on the ground they were not voluntary. His decision was clearly supported by substantial evidence.

The appealed order also rules that the furniture found upon inspection of a garage at defendants' residence following the interrogation of Mzhickteno is inadmissible. The ground relied upon for suppression is that the seizure of the furniture was a product of illegally obtained statements of defendants.

The State concedes that, as a general rule, physical evidence obtained as a result of unconstitutional practices is inadmissible. *Wong Sun v. United States,* 371 U.S. 471, 9 L.Ed.2d 441, 83 S.Ct. 407 (1963). However, the fruit of the poisonous tree doctrine is inapplicable where police discover evidence from an independent source, or where the connection between the unlawful conduct of police and discovery of the challenged evidence has become so attenuated as to dissipate the taint. *State v. McBarron,* 224 Kan. 710, 714, 585 P.2d 1041 (1978). Whether evidence is inadmissible under this doctrine is a fact question. *State v. Willis,* 7 Kan. App. 2d 413, 415, 643 P.2d 1112 (1982).

Our review of the record convinces us substantial competent evidence supports the trial judge's determination that seizure of the furniture was the fruit of the illegally obtained statements of defendants. *State v. Strecker,* 230 Kan. at 608; *State v. Parks,* 5 Kan. App. 2d at 645.

Affirmed.