No. 71,757

STATE OF KANSAS, *Appellee,* v. BRYANT L. COLBERT, *Appellant.*

(896 P.2d 1089)

 Opinion
filed June 2, 1995. 

*Benjamin C. Wood*, special appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Ann L. Smith*, county attorney, argued the cause, and *Robert T. Stephan*, was with her on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant appeals his convictions on one count of aggravated kidnapping, K.S.A. 21-3421; three counts of rape, K.S.A. 21-3502; two counts of aggravated burglary, K.S.A. 1991 Supp. 21-3716; one count of aggravated criminal sodomy, K.S.A. 21-3506, and one count of attempted aggravated criminal sodomy, K.S.A. 21-3506 and K.S.A. 1992 Supp. 21-3301. Defendant claims (1) his statutory right to a speedy trial was violated; (2) the prosecution failed to disclose exculpatory evidence; and (3) the trial judge improperly admitted: (a) evidence that one person committed all crimes, (b) a serological report without right of cross-examination, (c) DNA evidence, and (d) evidence seized under a search warrant. This court has jurisdiction pursuant to K.S.A. 1994 Supp. 22-3601(b)(1).

A series of five rapes was reported to the Coffeyville Police Department between April 1990 and January 1993. The first rape occurred on April 5, 1990. E.S. was asleep inside her residence on her couch. She awoke around 1:00 a.m. A black man entered her residence and raped her.

On August 12, 1990, S.S. was in her residence. At approximately 3:15 a.m., a friend introduced the defendant, a black male, to her. After her friend and the defendant went to the upstairs of the residence to talk, S.S. went to sleep in her bedroom. At approximately 4:00 a.m., S.S. heard her friend say she was leaving, but S.S. was unsure if the defendant left with her. The next thing S.S.

knew, a black male placed his hand over her mouth. She was raped. The man fled. The Coffeyville police were immediately notified of the crime. While searching for the suspect, an officer discovered the defendant in the vicinity and pursued him but was unable to catch him.

On August 6, 1991, S.C. was coming home from her boyfriend's house at 3:00 a.m. S.C. saw a black man running at her. She was dragged to the side of her house and raped. In April 1993, a person who identified himself as Bryant Colbert contacted S.C. by telephone and asked her for a date. S.C. recognized the voice as that of the man who raped her. The person who identified himself as Colbert called S.C. several times and questioned her about the rape. He advised S.C. that the police had suspected he had committed the rape, but that he was no longer a suspect because he had passed a DNA test.

In the early morning hours of December 5, 1992, S.V. was lying asleep on her couch. A man entered her house and told her that he wanted money. The man raped her and took her money. After the man left, S.V. drove to her parents' house and went to the hospital for a rape kit examination. S.V. was asked to go to the police station and look through mug books. She eventually picked two pictures that looked most like the attacker. She had told Detective Humble that she had observed the man only for two or three seconds.

Detective Humble stated that he had shown S.V. a six-person photo lineup. He testified that S.V. had picked Colbert's photograph as the person who looked most like her attacker. S.V. told police that the person who raped her had a high voice that sounded like a white person's voice. She gave Detective Humble the name of Dwight Dent as a suspect. Detective Humble did not pursue this information because he believed that Bryant Colbert had raped the women.

On the morning of January 9, 1993, D.F. was getting ready to leave home. When she opened the door, a black man with a black leather coat hiding his face rushed at her. D.F. had known Colbert since the third grade and considered him a "pretty good" friend. She told Detective Humble that the voice of the attacker sounded

like Colbert's, but because of the man's height and build, she did not believe the person who raped her was Colbert.

Detective Humble noted the similarities in the manner in which the women were raped, such as the language used by the perpetrator during the commission of the rapes, the fact that the rapist covered his face or the victim's, and that the attacker threatened to harm the victim or the victim's children. The detective testified that, prior to Colbert's arrest and obtaining the DNA evidence implicating Colbert, he had requested that the KBI conduct a "secreter status" test from evidence gathered during the investigation to determine if the same perpetrator had committed each of the crimes under investigation. The detective testified that the serology report and the various similarities between the crimes indicated that a single perpetrator had committed each of the rapes.

The police arrested Colbert and charged him with the five separate rapes. Apparently, the charges relating to the April 1990 rape of E.S. and the August 1990 rape of S.S. were barred by the two-year criminal statute of limitations. See K.S.A. 1990 Supp. 21-3106(3). The complaint was amended to charge one count of aggravated kidnapping, three counts of rape, two counts of aggravated burglary, one count of aggravated criminal sodomy, one count of attempted aggravated criminal sodomy, and one count of robbery.

A jury convicted Colbert on all counts except the robbery charge. Colbert was sentenced to life imprisonment for the aggravated kidnapping conviction, 15 years to life for each of the three rape convictions, 5 to 20 years for each of the two aggravated burglary convictions, 5 to 20 years for the aggravated sodomy, and 5 to 20 years for the attempted aggravated sodomy. All sentences were imposed consecutively. Colbert appealed.

### Right to a Speedy Trial

Colbert was unable to post bail for his pretrial release. Colbert argues he could not be prosecuted because the State failed to bring him to trial within 90 days after his arraignment and thereby denied him his statutory right to a speedy trial under K.S.A. 22-3402(1).

K.S.A. 22-3402(1) provides:

"If any person charged with a crime and held in jail solely by reason thereof shall not be brought to trial within ninety (90) days after such person's arraignment on the charge, such person shall be entitled to be discharged from further liability to be tried for the crime charged, unless the delay shall happen as a result of the application or fault of the defendant . . . ."

Colbert was arraigned June 23, 1993. Colbert's trial was originally set for September 15, 1993, within 90 days of his arraignment. On September 9, 1993, Colbert's defense counsel requested and obtained a continuance to allow additional time to prepare an alibi defense. The district judge noted that the additional time would be charged to Colbert. On September 14, 1993, the judge granted defense counsel's motion to withdraw because she had not been paid as per her contract with Colbert. New counsel was appointed to represent Colbert. The court assessed time for that delay to Colbert.

Because the defense was not ready for trial on September 15, a hearing was held on September 21, 1993, to set a new trial date. The district judge noted that Colbert's trial could be set for November 3, 1993, provided the preparation for Colbert's alibi defense had been completed by the defense and reasonable notice of the defendant's alibi defense had been given to the prosecution. If the defense was not prepared for trial on November 3, the next available court date would be February 10, 1994. On October 12, 1993, defense counsel requested that the case be continued past the November 3 trial date to allow additional time to prepare for trial. The judge granted the defendant's request for a continuance and assessed the delay to the defendant. The case was set and went to trial on February 10, 1994. Colbert's trial began 232 days after his arraignment. Colbert's argument is that the judge's assessment of all of the delay caused by his request for the continuance to him was unreasonable.

Delays which are the result of the application or fault of the accused, or extended by 22-3402(3)(c) to allow the prosecution to obtain material evidence, are not counted in computing the statutory speedy trial period. *State v. Green*, 254 Kan. 669, 672, 867 P.2d 366 (1994). Defense counsel's actions are attributable to the defendant in computing speedy trial violations. A defendant, by

requesting or acquiescing in the grant of a continuance, may waive the statutory right to a speedy trial. *State v. Bafford,* 255 Kan. 888, 891-92, 879 P.2d 613 (1994); *State v. Brown,* 249 Kan. 698, 704, 823 P.2d 190 (1991). Any additional period of time assessed against a defendant due to the necessity of rescheduling a trial because of a defendant's fault should be limited to a reasonable time measured by the particular circumstances of the case. *State v. Dreher,* 239 Kan. 259, 261, 717 P.2d 1053 (1986); *State v. Bean,* 236 Kan. 389, 393, 691 P.2d 30 (1984); *State v. Sherman,* 217 Kan. 326, 330, 536 P.2d 1373 (1975).

The district judge was aware of Colbert's statutory speedy trial rights. Before granting each of the continuances requested by the defendant, the judge informed him that the time requested would be charged to him and not count in the 90-day statutory period. The record reveals that the trial was set by the district judge for the first date available after defense counsel was prepared to proceed to trial. Under the circumstances, the trial judge's assessment of the entire delay caused or requested by the defendant was reasonable. Defendant's trial did not exceed the 90-day statutory limit.

## Failure to Disclose Exculpatory Evidence

Prior to trial defense counsel filed a motion for the State to produce all exculpatory evidence and requested a court order to interview the detective primarily responsible for the investigation. On the first day of the trial, one of the victims testified she had told the detective that she may have been raped by Dwight Dent. The detective testified that although he recalled the victim's implicating Dent, he received the information that Dent was a possible suspect just prior to receiving the KBI serology report implicating a single suspect. Under these circumstances, he did not investigate the possibility that Dent had committed the crimes. The prosecutor informed the judge that she had provided a copy of the report to Colbert's original defense counsel. Defense counsel moved for a mistrial or dismissal. The judge found there was no basis for concluding that the detective had "kept something hidden" from the State or Colbert and denied Colbert's motion.

Colbert asserts that the State intentionally withheld evidence. Colbert argues that the trial judge erred in (1) failing to grant a mistrial so that the evidence could have been investigated or (2) failing to dismiss the charges. The State asserts that no exculpatory evidence was withheld and argues that Colbert fails to prove he was prejudiced by nondisclosure of that information.

Prosecutors are under a positive duty, independent of court order, to disclose exculpatory evidence to a defendant. To justify a reversal of a conviction for failure to disclose evidence, the evidence withheld by the prosecution must be clearly exculpatory, and the withholding of the evidence must be clearly prejudicial to the defendant. Evidence is exculpatory if it tends to disprove a fact in issue which is material to guilt or punishment. Evidence not disclosed to the defendant before trial need not be suppressed or withheld from the jury if the defendant has personal knowledge thereof or if the facts become available to the defendant during trial and the defendant is not prejudiced in defending against them. *State v. Peckham*, 255 Kan. 310, Syl. ¶¶ 13, 14, 875 P.2d 257 (1994).

The serology report was not introduced into evidence. On appeal, Colbert does not explain how the KBI report indicating a single perpetrator committed the crimes was exculpatory evidence. Colbert's culpability was determined by the victims' testimony and the introduction of DNA evidence implicating him as the individual who had committed the rapes. Although Colbert's trial attorney had not been given a copy of the KBI preliminary serology report, prior to trial the defense was given the results of the DNA test that implicated Colbert. Colbert fails to show that he was prejudiced by the delay in disclosing that one of the victims had suggested another individual was a possible suspect and that he was not aware of the KBI serology report.

## Guilt Determination

Colbert asserts that allowing the detective to testify that the crimes were committed by the same perpetrator violated his constitutional right to have the jury determine whether he was guilty of all the crimes. The State argues that the detective did not testify

that Colbert was guilty of the crimes but merely stated how an analysis of the evidence caused him to believe that the same individual had committed the crimes.

During direct examination, the prosecutor asked the detective primarily responsible for the investigations what information led him to believe that the same perpetrator committed the separate crimes. The detective responded that he had observed numerous similarities in each of the rapes. The prosecutor then asked the detective what the particular similarities were. Defense counsel objected, claiming that testimony would invade the province of the jury and that the detective could only testify to his personal knowledge, not to conclusions. The judge overruled the objection, pointing out that the detective's personal knowledge included what he believed the similarities were. The detective then described the similarities to the jury, including the manner in which the women were raped, the language used by the perpetrator during the commission of the rapes, the fact that the rapist covered his face or the victim's during the commission of each rape, and the fact that the rapist had threatened to harm the victim or the victim's children. The detective further noted that the KBI serology report confirmed that each of the victims had been raped by the same man.

Colbert recognizes that it is the jury's function to weigh the evidence and determine the facts. See Kan. Const. Bill of Rights, §§ 5, 10; *State v. Steadman*, 253 Kan. 297, Syl. ¶ 2, 855 P.2d 919 (1993). He asserts that the admissibility of opinion testimony on the ultimate issue or issues has its limitations. He argues that opinion testimony is admissible only if it will aid the jury in the interpretation of the facts or assist in understanding the evidence.

Where the normal experience and qualification of the jurors permit them to draw conclusions from given facts and circumstances, opinions and conclusions of the witnesses are inadmissible. In a criminal trial, the defendant has the right to have the jury determine from the evidence whether the defendant is guilty. Police witnesses can testify from their experience as to a role the defendant played in an illegal enterprise—they cannot testify that in their opinion the defendant was guilty of the crime. We have observed that the admission of a witness' opinion that the defendant was

guilty of the crime, that the defendant exhibited the pressure felt by a guilty person, that other persons interviewed were not guilty of the crime, and that in an officer's opinion there was sufficient probable cause for the issuance of a search warrant for the defendant's residence deprived the defendant of his or her right to a fair trial. *State v. Steadman*, 253 Kan. 297, Syl. ¶¶ 1, 2.

Colbert fails to show that the detective's observation that certain similarities in the commission of the rapes leading him to believe the crimes were committed by one perpetrator invades the factfinding function of the jury. Contrary to Colbert's assertion, the detective did not state in his opinion that Colbert was guilty of the charges.

### Right to Cross-Examine

A primary interest secured by the Sixth Amendment Confrontation Clause is the right of cross-examination. *State v. Hamons*, 248 Kan. 51, 62, 805 P.2d 6 (1991). See *Ohio v. Roberts*, 448 U.S. 56, 63, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980). The Sixth Amendment, as made obligatory on the states by the Fourteenth Amendment, and § 10 of the Bill of Rights of the Kansas Constitution secure to the accused in all criminal prosecutions the fundamental right to confront the witnesses against them. See *State v. Willis*, 254 Kan. 119, Syl. ¶ 1, 864 P.2d 1198 (1993); *State v. Chisholm*, 245 Kan. 145, 149-50, 777 P.2d 753 (1989).

Colbert contends that he was denied his right to confrontation when the detective was allowed to refer to the KBI "secreter status" report without the author of the report present and available for cross-examination during the trial. The State does not directly address this argument. On review, this court must determine beyond a reasonable doubt whether the detective's mention of the KBI report violated Colbert's constitutional right to confrontation and, if so, whether such violation had little if any likelihood of changing the trial result. See *Willis*, 254 Kan. at 120; *State v. Knapp*, 234 Kan. 170, Syl. ¶ 7, 671 P.2d 520 (1983).

To support his argument, Colbert relies on *State v. Willis*, 254 Kan. 119. In *Willis*, a pathologist's deposition was read to the jury at trial. The defendant was not present at the taking of the depo-

sition and had not waived his right of confrontation. The deposition provided crucial evidence that the defendant had intentionally murdered his wife. The *Willis* court was unable to conclude beyond a reasonable doubt that the defendant's absence at the taking of the deposition and the admission of the deposition at trial had little if any likelihood of changing the result of the trial. It found that the defendant had been denied his right to confrontation, reversed the defendant's conviction, and remanded the case for a new trial.

In the present case, the detective testified as to his observations of the similarities between the rapes and how these similarities led him to conclude that the crimes were committed by the same perpetrator. The initial KBI report conclusion that one individual committed all of the crimes was not an integral part of the State's case to prove Colbert's guilt; it was one of the factors that influenced the scope of the officer's investigation of the crimes.

*Willis* is distinguishable. As opposed to the deposition in *Willis*, the KBI report did not provide evidence of Colbert's guilt. The detective was available for cross-examination. The detective's reference to the report did not violate Colbert's right to confrontation. Colbert fails to show he was prejudiced. We can determine beyond a reasonable doubt that the reference to the report had little if any likelihood of changing the trial result.

### Search Warrant

Generally, a party against whom a search warrant is directed may not dispute the matters alleged in the supporting affidavit or application for the warrant. An exception to this general rule is available if the challenger's attack to the supporting instruments is buttressed by allegations and an offer of proof under oath that the affidavit or application for search warrant contains (1) material statements of deliberate falsehood or reckless disregard for the truth or (2) deliberate omissions of material facts. *State v. Lockett*, 232 Kan. 317, Syl. ¶ 1, 654 P.2d 433 (1982). A person attacking an affidavit on the basis that it omitted information must prove that the omission was both deliberate and material. 232 Kan. at 319.

Colbert argues that blood, saliva, and hair evidence seized from his person pursuant to a search warrant for the State's DNA test

was obtained because the affidavit supporting the search warrant deliberately omitted material facts. Colbert points out that the affidavit for the search warrant omitted: (1) One of the victims had stated that she had seen Colbert since she was raped and did not believe he was a suspect; (2) although the same victim had identified Colbert from photographs as looking the most like the man who raped her, she had also stated that the rapist resembled another individual; (3) another victim stated that the rapist's voice sounded a lot like Colbert's but concluded that Colbert was not the rapist because of his height and build; and (4) one of the victims had informed the detective that another individual was a possible suspect. Colbert argues that if this additional information had been included in the affidavit, it would not state sufficient probable cause for the issuance of the search warrant.

Colbert filed a motion to suppress before trial. At the hearing on the motion, the State admitted that the omitted information was known when the affidavit was submitted. It argued that the omission of those facts was not material and would not have prevented the magistrate from finding probable cause to issue the search warrant. In a seven-page memorandum opinion, the judge ruled that "the affidavit, even with the omissions added, establishes probable cause that: (1) the crimes were committed; (2) they were committed by the same perpetrator; [and] (3) evidence of the crimes may be found on defendant['s body]."

K.S.A. 1994 Supp. 22-2502 provides that a search warrant shall be issued upon oral or written application "which states facts sufficient to show probable cause that a crime has been or is being committed." Probable cause is the reasonable belief that a specific crime has been committed and that the defendant committed the crime. It does not require evidence of each element of the crime or evidence to the degree necessary to prove guilt beyond a reasonable doubt. *State v. Abu-Isba*, 235 Kan. 851, 853-54, 685 P.2d 856 (1984). Probable cause has been described as " '[b]its and pieces of information . . . fitted together until a picture is formed which leads a reasonably prudent person to believe a crime has been . . . committed and that evidence of the crime may be found on a particular person or in a place or means of convey-

ance.' " *State v. Marks*, 231 Kan. 645, 647, 647 P.2d 1292 (1982) (quoting *State v. Morgan*, 222 Kan. 149, 151, 563 P.2d 1056 [1977]).

In reviewing the sufficiency of the affidavit; the district judge noted:

"A series of five similar rapes were reported over a three-year period in Coffeyville, Kansas. Kits collected from three of the victims (E.S., S.C., and S.V.) analyzed by the Kansas Bureau of Investigation, determined that the same donor/perpetrator had contributed to all three victims.

"Additional similiarities among the five rapes:
- all were early morning crimes,
- committed at or in the victim's residence,
- by a black male,
- whose mode of operation was essentially the same, *i.e.*,
 - he attempted vaginal penetration from the rear,
 - with the victims on their hands and knees,
 - he attempted to cover the face of either his victim or himself with clothing or a cloth covering,
 - he threatened each of the victims with personal injury to either themselves or children present in the residence,

lead to a reasonable conclusion that the same perpetrator committed all five rapes."

The State points out that even if the omissions were deliberate, the omissions must be material. See *Lockett*, 232 Kan. at 320. The judge specifically examined each omission, except the subsequent statement made at trial by a victim suggesting that another individual was a possible suspect. The judge concluded that the affidavit, even with the omissions added, established sufficient probable cause to issue the search warrant. After reviewing the affidavit, we find that even if all the omissions had been included, there was sufficient probable cause for the magistrate to issue the search warrant.

## Admission of DNA Evidence

At trial, the State introduced the testimony of a KBI forensic scientist specializing in DNA analysis. The witness was recognized by the trial judge as an expert in the field of DNA testing. The witness explained in detail the analytical process of DNA profiling. The expert stated that the statistical probability assigned for the

frequency of certain genetic types is the result of a population study and its resultant data base. The expert testified that the DNA banding patterns of the known blood sample from Colbert matched the DNA banding patterns obtained from the evidence collected from each victim. The expert stated the statistical probability of selecting an unrelated individual at random from the population having a matching DNA profile.

On cross-examination, the expert acknowledged that he could not speak for the entire scientific community as to whether the publications of the Committee on DNA Technology and Forensic Science are generally accepted. The expert admitted that he was not an expert in population genetics. Defense counsel then proceeded to read several portions of a Committee report which stated that "the genetic correlation among relatives warrants caution in the statistical interpretation of DNA typing results." When asked how the FBI or KBI population data base represents the actual population of Coffeyville, Kansas, the expert stated that he was not qualified to answer that question.

The State introduced the KBI reports from the DNA analysis of each of the victims into evidence. Defense counsel objected, arguing that the population data base used had no relevancy to this case because the analysis did not accurately represent the population of Coffeyville, Kansas. The trial judge admitted the DNA evidence over the defendant's objection.

Colbert argues that there was inadequate foundation for admission of the DNA evidence at trial because the State's expert was not qualified to discuss the methodology by which the data base was gathered or explain how the data base related to the population in the Coffeyville area. Colbert emphasizes that the State's expert admitted he was not an expert in population genetics and could not speak for the whole scientific community. Colbert concludes that the State failed to show the acceptance of the expert's overall techniques and procedures and failed to show that, without a data base of the Coffeyville population, those techniques were capable of producing reliable results generally accepted by the scientific community.

The State responds that the trial judge properly exercised discretion in admitting the evidence. It asserts that the DNA profile statistics were based on population studies that had general acceptance in the scientific community and were properly admissible. It points out that in *Smith v. Deppish*, 248 Kan. 217, 236, 807 P.2d 144 (1991), this court stated that before expert scientific opinion may be received into evidence, the basis of that opinion must be shown to be generally accepted as reliable within the expert's particular scientific field. If a new scientific technique's validity has not been generally accepted as reliable or is only regarded as an experimental technique, then expert testimony based upon its results should not be admitted into evidence.

This court embraced the admissibility of population studies used in DNA profiling in *State v. Dykes*, 252 Kan. 556, 847 P.2d 1214 (1992). In *Dykes*, an issue concerned the denial of defendant's request for discovery of the population data base used in DNA profiling. This court noted that the Hawaii Supreme Court's discussion of DNA testing in *State v. Montalbo*, 73 Hawaii 130, 828 P.2d 1274 (1992), was helpful. The Hawaiian court found little reason for concern regarding the theory underlying the statistical evidence. It noted that the statistics and the underlying sampling were not novel or controversial. It took judicial notice that the DNA paradigm was not controversial and is widely accepted in the relevant scientific community. It recognized that the theory of DNA testing is " 'unanimously accepted amongst scientists and lawyers' " and the techniques used are not novel but that it is the transfer of the technique to the context of DNA forensic identification which has generated much of the dispute. *Dykes*, 252 Kan. at 562 (quoting *Montalbo*, 73 Hawaii at 141). It concluded that the basic techniques underlying the analysis used by the FBI are widely accepted. *Montalbo*, 73 Hawaii at 141. See *People v. Castro*, 144 Misc. 2d 956, 960, 545 N.Y.S.2d 985 (1989); Thompson and Ford, *DNA Typing: Acceptance and Weight of the New Genetic Identification Tests*, 75 Va. L. Rev. 45, 60-61, 64-76 (1989).

In *Smith v. Deppish*, this court noted that DNA print testing and the process of Restriction Fragment Link Polymorphism Analysis have been recognized as reliable, have gained general accep-

tance in the scientific community, involve scientifically and professionally established techniques, and, thus, meet the criteria for admissibility under the standard set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

While DNA print testing and the process of Restriction Fragment Link Polymorphism Analysis meet the standard of general acceptance in the scientific community and thus are admissible on that basis, such test results may be inadmissible on grounds of relevancy or prejudice as well as under traditional challenges to admissibility of evidence such as contamination of the sample or chain of custody questions. *Deppish*, 248 Kan. 217, Syl. ¶ 7. Generally, whether an adequate evidentiary foundation was laid for the introduction of evidence is a question for the trial court and largely rests in its discretion. So long as there is substantial competent evidence to support the finding, it will not be disturbed on appeal. *City of Overland Park v. Cunningham*, 253 Kan. 765, Syl. ¶ 6, 861 P.2d 1316 (1993).

Given this court's previous decisions, defense counsel's arguments concerning the accuracy of the statistical probability of the KBI reports from the DNA analysis were directed at the weight to be given the evidence by the jury, not its admissibility. The trial judge did not abuse his discretion in admitting the DNA evidence.

Affirmed.