IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 127,745

STATE OF KANSAS,
*Appellee*,

v.

JEREMY VOLLE,
*Appellant*.

SYLLABUS BY THE COURT

1.

The Fourth Amendment to the United States Constitution requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The scope of section 15 of the Kansas Constitution Bill of Rights is identical to that of the Fourth Amendment to the United States Constitution.

2.

A warrant satisfies the constitutional standard when it describes the evidence to be searched with sufficient particularity to permit the executing officer to locate the same from the face of the warrant. The standard, however, does not demand absolute precision; it requires only that the warrant describe the property with as much specificity as the government's knowledge and circumstances allow. The degree of specificity required depends on the nature of the property and the facts known to officers at the time the warrant issued.

1

3.

Separate from the method of search, the Fourth Amendment requires that a warrant specify with particularity the type of evidence to be seized, and a valid warrant must include a limiting principle that confines the authorized seizure to evidence of the offense under investigation.

4.

Courts evaluate electronic-device warrants under the same practical standard applied to physical searches, asking only whether the description of items to be seized is as particular as the circumstances reasonably allow. So long as the warrant contains a clear limiting principle it is sufficiently particular.

5.

Neither the Fourth Amendment nor section 15 of the Kansas Constitution Bill of Rights mandate exclusion of unlawfully obtained evidence; the exclusionary rule is a judicial deterrent, applied only when suppression would meaningfully deter police misconduct.

6.

Evidence is admissible under the inevitable discovery doctrine if the State proves by a preponderance of the evidence that it would have been lawfully discovered absent the unconstitutional conduct.

7.

An inmate has no reasonable expectation of privacy in nonlegal outgoing mail that is subject to inspection based on legitimate security or investigative purposes under jail policy.

8.

An aiding-and-abetting instruction is proper when the evidence permits a reasonable conclusion that the defendant knowingly and intentionally participated in a criminal venture; mere presence or association is insufficient to establish accomplice liability.

9.

Cumulative trial errors, when considered together, may require reversal of the defendant's convictions when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial.

10.

A felony-murder conviction predicated on criminal discharge of a firearm at an occupied motor vehicle is supported when the evidence shows a reckless discharge at an occupied vehicle, even if the shooter's intent was directed at a person rather than the vehicle itself.

11.

Felony murder and reckless second-degree murder are distinct offenses under K.S.A. 21-5109(d), and when both are found in the alternative, the convictions merge and sentencing on the greater offense—felony murder—is proper.

Appeal from Shawnee District Court; CHERYL RIOS, judge. Oral argument held September 9, 2025. Opinion filed December 12, 2025. Affirmed.

*Peter T. Maharry*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

3

*Carolyn A. Smith*, assistant deputy district attorney, argued the cause, and *Mike Kagay*, district attorney, and *Kris W. Kobach*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

STANDRIDGE, J.: This is Jeremy Francis Volle's direct appeal following his convictions for first-degree felony murder and criminal possession of a weapon. Volle raises multiple claims of trial and sentencing error, including two evidentiary issues and challenges to a jury instruction, sufficiency of the evidence, and sentencing. He also argues cumulative error.

For the reasons below, we affirm Volle's convictions and sentence. The district court did not err in denying either of Volle's motions to suppress evidence or in instructing the jury. In the absence of any error, Volle's cumulative error argument also fails. Finally, the State presented sufficient evidence to support Volle's felony-murder conviction, and the district court properly sentenced him for this crime.

FACTS

In the early morning hours of May 27, 2021, Aaron Shepherd and his wife, Megan, were driving around Topeka collecting scrap metal from dumpsters. While Shepherd drove down the 1100 block of 17th Street, Megan slept in the front passenger seat of their Ford Taurus. She woke up when Shepherd braked suddenly and she saw an SUV speeding past. Shepherd told Megan that someone was chasing and shooting at them, and he asked her to call 911. While Megan looked for her phone, Shepherd grabbed Megan's BB gun, exited the car, and crouched near the open driver's side door as the SUV drove by again. After the SUV passed, Shepherd tossed the BB gun back into the car but remained outside, raising his arms and yelling. The SUV turned off 17th Street

4

and stopped. At this point, Megan saw a red laser beam hit Shepherd, heard a single gunshot, and watched Shepherd fall to the ground. Shepherd was critically wounded and later died at the hospital.

Based on witness accounts of the shooting and video evidence collected from the surrounding area, law enforcement identified a Chevy Trailblazer owned by Brandon Croskey as the vehicle from which the gunshot was fired. Topeka Police Detective Jared Strathman interviewed Croskey, who ultimately admitted involvement and identified Volle as the shooter.

The State charged Volle with criminal possession of a weapon and alternative counts of first-degree felony murder and first-degree premeditated murder. To support the felony-murder charge, the State alleged Volle killed Shepherd while committing the inherently dangerous felony of criminal discharge of a firearm at an occupied motor vehicle.

The case proceeded to trial, where the jury heard conflicting testimony from Croskey and Volle, with each implicating the other in the shooting.

Croskey testified at trial, having previously pled guilty to reckless second-degree murder and criminal discharge of a firearm at an occupied motor vehicle. As part of his plea agreement, he agreed to provide truthful testimony for the State. Croskey testified that around 4:30 a.m. on May 27, 2021, he was at a car wash at 21st and Wanamaker in his Chevy Trailblazer, where he encountered Shepherd—a man he did not know—and the two exchanged words. Croskey said he became upset and wanted to fight after Shepherd called him a racial slur. Croskey left the car wash and called Volle to be his backup in case Shepherd had a knife or gun.

Croskey went to Volle's house near 17th and Buchanan, and Volle eventually came outside and got into the front passenger seat of the Trailblazer. Croskey started driving and turned onto 17th Street, where he saw Shepherd's car and tried to cut him off. After Shepherd drove around him, Croskey did a U-turn and caught up to Shepherd, following close behind and then passing him when Shepherd slammed on his brakes. Croskey did another U-turn and drove toward Shepherd's car. Croskey watched Shepherd crouch between the open driver's side door and the car, holding what appeared to be a firearm out the window. Croskey ducked down and then noticed Volle pulling a gun out of his shorts pocket. Croskey testified he was shocked because he told Volle not to bring a gun. Volle told Croskey to turn off 17th Street and stop so that he could take aim at Shepherd. After Croskey did so, Volle leaned out of the passenger window, aimed the laser on his gun at Shepherd, and fired one shot. Croskey then drove back to Volle's house, where both men went inside and Croskey stayed for a few hours. Volle told Croskey that he fired the shot because he wanted to see if the beam on his gun was accurate. Volle also told Croskey not to contact the police and said that he should get rid of his truck. Croskey later spray painted his Trailblazer blue but continued to drive it after the shooting. When Croskey was interviewed by Detective Strathman, he did not immediately identify Volle as the shooter because he was scared of Volle and feared what Volle might do.

Volle testified in his defense. He said he did not know Shepherd and denied shooting him. Volle said Croskey arrived at his house upset about something, but he did not know why Croskey wanted to meet up. Volle claimed he did not take a gun with him when he got into Croskey's Trailblazer. He testified Croskey drove to 17th Street, tried to cut off Shepherd's car, and then began following Shepherd. As they passed Shepherd's car, Volle saw Shepherd pointing a gun at them but did not know it was a BB gun. After Volle saw the gun, he was scared and told Croskey to take him home. Instead, Croskey turned around and drove back toward Shepherd's car. Volle noticed Croskey had a gun in

his hand as he drove by Shepherd, so Volle lay back in his seat. After turning off 17th Street and coming to a stop, Croskey leaned over Volle and fired a single shot through the passenger window. As Croskey drove away, Volle took the gun from the cup holder and put it in his pocket because he recognized the gun as belonging to him. Volle did not know that Croskey had the gun or how he had come to possess it. Volle assumed that the mother of his children, who was friends with Croskey, loaned Croskey the gun.

Volle said that when they went back to his house, they listened to the police scanner for information about the shooting and later saw a news article confirming Shepherd's death. Volle believed that Croskey was defending himself, because Croskey told him that Shepherd had used a racial slur at the car wash and that Shepherd chased Croskey with a gun. Volle did not want to cooperate with law enforcement because he did not want to snitch on Croskey. Volle denied ever threatening Croskey after the shooting or discouraging him from talking to the police. Volle claimed he told Croskey to leave him out of it if he did talk to the police because he had nothing to do with the shooting. According to Volle, Croskey did not seem afraid of him. Volle admitted that videos from his phone after the shooting showed him wiping the gun for fingerprints and talking to Croskey about looking for the shell casing and selling the gun or taking it "out of commission." And Volle admitted that the videos captured him telling Croskey not to leave in the morning before they could talk. Volle also said, "I think we're good," "I don't think nobody saw the car," and, "Don't tell nobody, bro."

A jury convicted Volle of first-degree felony murder, the alternative lesser included offense of reckless second-degree murder, and criminal possession of a firearm.

Before sentencing, Volle moved the district court to impose a sentence for reckless second-degree murder because it was a more specific crime and therefore should control his sentence under K.S.A. 21-5109(d). At sentencing, the court denied the motion,

7

merged the murder convictions into a single conviction for felony murder, and imposed a controlling sentence of life without the possibility of parole for 620 months.

Volle directly appealed his convictions to this court. Jurisdiction is proper. See K.S.A. 60-2101(b) (Supreme Court jurisdiction over direct appeals governed by K.S.A. 22-3601); K.S.A. 22-3601(b)(3)-(4) (life sentence and off-grid crime cases permitted to be directly taken to Supreme Court); K.S.A. 21-5402(b) (first-degree murder is off-grid person felony).

ANALYSIS

On appeal, Volle argues: (1) the district court erred in denying his motions to suppress evidence, (2) the district court erred in instructing the jury on aiding and abetting, (3) the cumulative effect of these errors deprived him of his constitutional right to a fair trial, (4) the evidence was insufficient to support his conviction for first-degree felony murder, and (5) the district court erred in sentencing Volle for his felony-murder conviction rather than for reckless second-degree murder. We address each of Volle's arguments in turn.

I. *Motions to suppress*

Volle argues the district court erred when ruling on two motions to suppress evidence: one regarding evidence law enforcement obtained from a search of his cell phone and one regarding letters he wrote while in pretrial custody at the Shawnee County Jail.

When, as here, the material facts supporting a district court's decision on a motion to suppress evidence are undisputed, suppression is a question of law subject to unlimited appellate review. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018).

8

The Fourth Amendment to the United States Constitution and section 15 of the Kansas Constitution Bill of Rights protect all persons against unreasonable searches and seizures. *State v. Baker*, 306 Kan. 585, 589-90, 395 P.3d 422 (2017) (The Fourth Amendment applies to the states through the Fourteenth Amendment.); *State v. Daniel*, 291 Kan. 490, 498, 242 P.3d 1186 (2010) (interpreting section 15 to provide the same protections as the Fourth Amendment). The State bears the burden of proving the lawfulness of a search and seizure. *State v. Hillard*, 315 Kan. 732, 747, 511 P.3d 883 (2022).

A. *Motion to suppress cell phone evidence*

After Croskey identified Volle as the shooter, law enforcement obtained a search warrant for Volle's residence. When officers executed the search warrant, they found Volle at the home and arrested him. At the time of his arrest, Volle had a black Samsung cellular phone in his pocket. Law enforcement seized the phone and sought a separate search warrant for it.

In the affidavit in support of the search warrant for the phone, Detective Strathman recounted the general investigation into the case and stated: "I am asking for a search warrant for the phones as during my interview with [Croskey], he stated [Volle] had been contacting him since the homicide occurred. Furthermore I know cellular devices are capable of tracking movements through GPS if the location data is turned on." A district court judge granted the State's application for a search warrant authorizing the following search of Volle's cell phone:

> "Any and all electronically stored information, including but not limited to Call Logs,
> Text Messages, Multimedia Messaging, Pictures/videos, Messages, Information from

9

Third Party Apps, Contacts Lists, device locations and any other form of electronically stored information associated with either crimes listed herein or identifying information to determine ownership of the searched devices.

"Which items are contraband or are fruits, instrumentalities or evidence of K.S.A. 21-5402 Murder in the 1st Degree, are located in or upon:

"Black Samsung cell phone IMEI 353327111435079 seized from Jeremy Volle."

Before trial, Volle moved to suppress the cell phone evidence alleging the affidavit lacked probable cause and contained factual misrepresentations, and the search warrant was overbroad. As a result, Volle claimed the exclusionary rule applied and required suppression of the evidence.

After considering written and oral argument by the parties, the district court denied Volle's motion to suppress. Although the district court agreed with Volle that the affidavit failed to establish probable cause, it ultimately denied Volle's motion to suppress after finding that the good-faith exception and, alternatively, the inevitable discovery doctrine rendered the cell phone evidence admissible. The court also determined that the warrant was not overbroad, contained no factual misrepresentations, and was executed reasonably. Over Volle's objection at trial, the State introduced evidence obtained from the search of Volle's cell phone.

On appeal, Volle argues (1) the search warrant was overbroad, (2) the good-faith exception does not apply because the affidavit contained factual misrepresentations, and (3) the inevitable discovery doctrine is inapplicable because the evidence would not have been discovered by lawful means absent the unconstitutional conduct.

The State defends the district court's findings that the warrant was not overbroad, that the affidavit contained no factual misrepresentations, and that the good-faith and

inevitable-discovery exceptions rendered the evidence admissible. The State further asserts—without having filed a cross-appeal—that this court may nonetheless affirm the district court's ruling as right for the wrong reason because, in its view, the affidavit itself established sufficient probable cause to support the search.

Before reaching the merits of the suppression issues, we must first determine whether the State's probable-cause argument is properly before us. Kansas law requires an appellee to cross-appeal a district court's adverse decisions before those rulings may be challenged on appeal. *Cooke v. Gillespie*, 285 Kan. 748, 755, 176 P.3d 144 (2008); see K.S.A. 60-2103(h) (cross-appeal required when "appellee desires to have a review of rulings and decisions of which such appellee complains"). The State acknowledges that it did not file a cross-appeal but contends that a cross-appeal was unnecessary because the district court's finding of no probable cause was not an adverse ruling.

The State's argument fails for two reasons. First, the governing statute does not limit the cross-appeal requirement to "adverse" rulings. K.S.A. 2024 Supp. 60-2103(h) provides that an appellee who seeks review of "rulings and decisions of which such appellee complains" must file a notice of cross-appeal within 21 days after the notice of appeal is filed. The statute's plain language encompasses any ruling the appellee seeks to challenge, regardless of whether it altered the outcome of the judgment.

Second, even if an "adverse" component were required, the district court's determination that the warrant affidavit lacked probable cause was plainly adverse to the State's position, even though the court ultimately denied the motion to suppress on other grounds. See Merriam-Webster Online Dictionary (defining "adverse" as "opposed to one's interests" or "unfavorable").

11

The State's failure to pursue a cross-appeal prevents us from reviewing the district court's probable cause determination. See *State v. Novotny*, 297 Kan. 1174, 1181, 307 P.3d 1278 (2013) (holding appellee abandoned alternative grounds for affirming district court's ultimately favorable suppression ruling when it failed to cross-appeal court's adverse ruling on the alternative grounds). Accordingly, we decline to consider the State's probable-cause argument.

1. *Suppression based on overbreadth*

Volle contends the district court should have suppressed evidence obtained from his cell phone because the search warrant lacked the particularity required by the Fourth Amendment. He argues the warrant was so sweeping that it allowed officers to search "everything and anything" on his phone, leaving no meaningful limits on its scope.

The Fourth Amendment to the United States Constitution requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." "'The scope of Section 15 of the Kansas Constitution Bill of Rights is identical to that of the Fourth Amendment to the United States Constitution.'" *State v. Patterson*, 304 Kan. 272, 275, 371 P.3d 893 (2016) (citing *State v. LeFort*, 248 Kan. 332, 334, 806 P.2d 986 [1991]; K.S.A. 2015 Supp. 22-2502[a] [authorizing the issuance of search warrants "'which particularly describes a person, place or means of conveyance to be searched and things to be seized'"]). A warrant satisfies the constitutional standard when it describes the evidence to be searched "'with sufficient particularity to permit the executing officer to locate the same from the face of the warrant.'" *Patterson*, 304 Kan. at 275 (citing *LeFort*, 248 Kan. at 334-35).

12

The Fourth Amendment, however, does not demand absolute precision; it requires only that the warrant describe the property "'with as much specificity as the government's knowledge and circumstances allow.'" *United States v. Riccardi*, 405 F.3d 852, 862-63 (10th Cir. 2005) (citing *United States v. Leary*, 846 F.2d 592, 600 [10th Cir. 1988]). The degree of specificity required depends on the nature of the property and the facts known to officers at the time the warrant issued. 405 F.3d at 862. Kansas courts apply a comparable standard, holding that "the test to prevent general searches is one of practical accuracy rather than one of technical sufficiency, and absolute precision in the search warrant is not required in identifying the property to be seized." *State v. LeFort*, 248 Kan. 332, 334-37, 806 P.2d 986 (1991); see also *State v. Ames*, 222 Kan. 88, 92, 563 P.2d 1034 (1977). Thus, so long as the warrant describes the evidence to be seized with as much particularity as the circumstances reasonably allow, it satisfies both the Fourth Amendment and Kansas constitutional standards.

Although courts recognize that electronic devices pose unique challenges under the Fourth Amendment's particularity requirement, they treat those challenges as part of the circumstances that determine how particular a warrant need reasonably be. See, e.g., *United States v. Burgess*, 576 F.3d 1078, 1094 (10th Cir. 2009). *Burgess* explains that the particularity requirement does not demand a warrant to specify the precise folders, file paths, or search techniques officers must use when examining a digital device. Because relevant information may be stored anywhere on such a device, it is ordinarily impractical—and sometimes impossible—for a warrant to prescribe in advance how officers must locate that data. 576 F.3d at 1094.

But *Burgess* addresses only the method of executing a digital search; it does not resolve the separate question of what evidence officers may seize. The Fourth Amendment imposes a distinct requirement that the warrant describe with particularity the type of evidence it authorizes officers to seize. Thus, even though investigators may

13

need to review broad portions of a device's contents to locate relevant material, the warrant must still include a meaningful limiting principle tying the authorized seizure to evidence of a specified offense. See *United States v. Palms*, 21 F.4th 689, 698-99 (10th Cir. 2021).

Here, the warrant satisfied both aspects of the particularity requirement. It permitted investigators to create a complete forensic image of the phone—a breadth that *Burgess* recognizes as practically necessary—and it expressly limited the authorized seizure to electronic data related to first-degree murder or identifying the phone's owner. This limiting principle kept the search anchored to the probable-cause showing and prevented the kind of exploratory rummaging the Fourth Amendment forbids. Accordingly, the district court properly rejected Volle's overbreadth claim.

2.  *Suppression based on inapplicability of the good-faith exception and the inevitable discovery doctrine*

Volle also claims the absence of probable cause barred admission of the cell phone evidence and that neither the good-faith exception nor the inevitable discovery doctrine justified its use. Before turning to the specific exceptions at issue, it helps to review the principles governing the exclusionary rule and its role in enforcing Fourth Amendment protections.

Notably, neither the Fourth Amendment nor section 15 of the Kansas Constitution Bill of Rights expressly prohibits evidence obtained in violation of their respective protections. Rather, a judicially created remedy—the exclusionary rule—exists "to prevent the use of unconstitutionally obtained evidence in a criminal proceeding against the victim of the illegal search." *Daniel*, 291 Kan. at 496. This exclusionary rule protects Fourth Amendment rights through deterrence and only applies when the rule's deterrent effect will be achieved. *Herring v. United States*, 555 U.S. 135, 137, 129 S. Ct. 695, 172

14

L. Ed. 2d 496 (2009) ("[S]uppression is not an automatic consequence of a Fourth Amendment violation. Instead, the question turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct."); *Daniel*, 291 Kan. at 496 ("'[A]pplication of the exclusionary rule properly has been restricted to those situations in which its remedial purpose is effectively advanced.'"). Therefore, when considering whether suppression is proper under the specific circumstances of each case, courts must balance the deterrent effect of suppressing evidence against societal harms. *Herring*, 555 U.S. at 141.

There are exceptions to the exclusionary rule which allow for the admission of evidence that was obtained in violation of the Fourth Amendment. Relevant here, the district court held the cell phone evidence was admissible under the good-faith exception and the inevitable discovery doctrine. See *Daniel*, 291 Kan. at 497-500 (good-faith exception); *Baker*, 306 Kan. at 591 (inevitable discovery doctrine). Volle challenges the district court's conclusion that these exceptions applied. The question of whether an exception to the exclusionary rule applies is a question of law, reviewed by this court independently and without any required deference to the district court. See *State v. Hoeck*, 284 Kan. 441, 447, 163 P.3d 252 (2007).

i.  *Good-faith exception*

The United States Supreme Court first recognized the good-faith exception in *United States v. Leon*, 468 U.S. 897, 920-25, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). Under this exception, the Fourth Amendment exclusionary rule should not be applied to bar evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be invalid except where:

"'(1) the magistrate issuing the warrant was deliberately misled by false information; (2) the magistrate wholly abandoned his or her detached or neutral role; (3) there was so little indicia of probable cause contained in the affidavit that it was entirely unreasonable for the officers to believe the warrant was valid; or (4) the warrant so lacked specificity that officers could not determine the place to be searched or the items to be seized.'" *State v. Hubbard*, 309 Kan. 22, 33, 430 P.3d 956 (2018).

These circumstances should not occur often; the threshold to avoid application of the *Leon* good-faith exception is high. *State v. Zwickl*, 306 Kan. 286, 295, 393 P.3d 621 (2017). Good faith is measured by an objective standard—how a reasonable law enforcement officer would view the circumstances. *Leon*, 468 U.S. at 919-20.

Because the State bears the burden of proving that the challenged police conduct was permissible, the State must prove facts warranting application of the good-faith exception. See *Leon*, 468 U.S. at 924; *State v. Cleverly*, 305 Kan. 598, 605, 385 P.3d 512 (2016). To satisfy its burden here, the State asserts that the warrant was not obviously deficient and contends that law enforcement exhibited good faith in their investigative efforts and in no way deliberately misled the judge who issued the warrant.

Volle takes issue with the State's position, arguing the good-faith exception does not apply because Detective Strathman deliberately misled the issuing judge by omitting material information from the search warrant affidavit. As this court has recognized, a deliberate omission may be equivalent to an affirmative misstatement if it misleads the magistrate. *State v. Probst*, 247 Kan. 196, 206, 795 P.2d 393 (1990). A person attacking an affidavit on the basis that it omitted information must prove that the omission was both deliberate and material. *State v. Colbert*, 257 Kan. 896, 905, 896 P.2d 1089 (1995). Thus, Volle must establish that inclusion of these omitted facts would have had some bearing on the issuing judge's probable cause determination. See *State v. Adams*, 294 Kan. 171, 179, 273 P.3d 718 (2012); *State v. Lockett*, 232 Kan. 317, 320, 654 P.2d 433

16

(1982) (materiality determined by inquiring whether issuing judge would have found probable cause if omitted material had been included).

In support of his argument, Volle focuses on Detective Strathman's statement in the affidavit that he was seeking a search warrant for Volle's phone because Croskey stated during his interview that Volle had been contacting him since the shooting. He contends this statement, which suggested there would be communication such as texts between Volle and Croskey on Volle's phone, was misleading because Detective Strathman omitted the following material information from the affidavit:

- Croskey only gradually revealed more information during the interview and gave it in "varying shades of honesty."

- When asked directly whether he shared text messages with Volle about the shooting, Croskey said "'I don't know, I don't think so.'"

- When asked whether he sent anybody any text messages about the shooting, Croskey said, "'Huh-uh,'" and shook his head no.

Volle asserts that Detective Strathman's failure to include this information in the affidavit constitutes a deliberate and material omission because including it would have led the issuing judge to realize that no communication between Volle and Croskey would be found on Volle's cell phone and thus deny the application for the warrant.

But the record fails to support Volle's claim that Detective Strathman deliberately withheld material information from the search warrant affidavit that would have had some bearing on the issuing judge's probable cause determination. In the affidavit, Detective Strathman recounted Croskey's statement that Volle had been contacting

17

Croskey since the shooting. Notably, the information provided by Detective Strathman in the affidavit was true regardless of whether Croskey and Volle exchanged text messages—during Croskey's interview, he told Detective Strathman that Volle had tried to contact him on his cell phone after the shooting and that he had Volle's number saved in his phone. And despite Volle's suggestion otherwise, Croskey did not definitively deny that he and Volle had exchanged text messages about the shooting. While Croskey appeared relatively certain that he had not sent anyone else text messages about the shooting, he could not say for sure whether he and Volle had texted about it.

Moreover, it is unclear how any information about Croskey's honesty would have impacted the court's decision to issue the warrant. If anything, these details, coupled with Croskey's equivocation, could have reinforced an inference that Volle's phone contained relevant communications. Thus, Detective Strathman's declaration in the search warrant affidavit recounting Croskey's statement that Volle had been contacting him since the shooting was not inaccurate or misleading, and the omitted information does not make it so.

In sum, there is no evidence to support Volle's claim that Detective Strathman's omission was either deliberate or material such that it undermines the affidavit's reliability. The warrant was not obviously deficient, and law enforcement acted in objectively reasonable reliance on it. Because there was no misconduct to deter, the good-faith exception applies. See *Herring*, 555 U.S. at 137 (purpose of the exclusionary rule is to deter police misconduct). The district court did not err in finding that the good-faith exception rendered the cell-phone evidence admissible.

18

## ii. *Inevitable discovery doctrine*

The inevitable discovery doctrine allows for the admission of unconstitutionally obtained evidence if the evidence would have been discovered by lawful means absent the unconstitutional conduct. *Baker*, 306 Kan. at 591 (explaining that "'punishment for an act that does no harm is not required in order to deter harmful acts'"). The State must establish inevitability by a preponderance of the evidence. 306 Kan. at 591.

The district court held that the evidence from Volle's cell phone should not be suppressed because it would have been discovered from an independent source—Croskey's phone. Volle disagrees, arguing that the search of his phone was not inevitable. He alleges that Croskey's phone only contained innocuous text message exchanges between them that do not establish any basis for a search of Volle's phone.

But Volle's argument ignores the fact that Croskey, the initial suspect in the murder investigation, named Volle as the shooter during his interview with law enforcement and said that he had been in contact with Volle before and after the shooting. Based on this information, law enforcement sought a search warrant for the data on both Croskey's and Volle's cell phones. So even if law enforcement had only searched Croskey's phone, call logs and text messages from Croskey's phone around the time of the murder would have ultimately led law enforcement to Volle and his phone. Therefore, the district court did not err in finding the inevitable discovery doctrine applied.

## iii. *Conclusion*

The district court properly admitted the cell-phone evidence under both the good-faith and inevitable-discovery exceptions to the exclusionary rule. Thus, the district court did not err in denying Volle's motion to suppress the cell phone evidence.

19

B.     *Motion to suppress jail letters*

Volle also argues that the district court erred in denying his motion to suppress evidence obtained from the search of his mail while in custody at the Shawnee County Jail.

Following Volle's arrest, he was held at the Shawnee County Jail. When inmates arrive at the jail, they are provided with a physical copy of an Inmate Handbook. The handbook may also be available in a digital format that inmates can access. The handbook sets forth the jail's rules and expectations as well as inmate rights and responsibilities. Relevant here, the handbook provides:

- "You have the right to communicate with family, friends, and others via written correspondence, telephone calls, and/or visits according to facility rules, regulations, and schedules."

- "You shall be allowed to correspond in writing with persons or organizations outside of this facility, unless there is a specific reason(s) to prohibit the correspondence to protect the safety and security of the recipient, the public, or the staff and inmates of the facility. Mail shall be limited to your personal correspondence with individuals outside the facility. *All incoming and outgoing mail shall be subject to search at any time*." (Emphasis added.)

After Volle's arrest, Detective Strathman requested that the jail monitor Volle's outgoing mail. According to the detective, it is common practice to monitor mail in cases involving co-defendants "[p]artly because people that are incarcerated and don't have

20

access to the other party typically will go through somebody else to either send them a message or something of that affect, or communicate about the case."

After receiving the request from Detective Strathman, Shawnee County Jail Lieutenant Matt Biltoft collected, opened, and scanned Volle's nonlegal mail and sent digital copies to Detective Strathman. Two of Volle's outgoing letters caught the detective's attention. The first letter was addressed to Destiny Baker and reads, in relevant part:

"So, I'm not technically allowed to try to influence [Croskey] myself or threaten him, but if u were ta guide him N the direction he should prolly go it's not against the rules. Essentially you'll have to make him understand some things u already know. First and foremost-bein a snitch . . . is extremely dangerous 4 him.

"What's done is done tho now. He already wrote a statement and made up a story bcuz his mind was fucked up. They're prolly gonna offer him 60-120 months to testify on me. What they aren't gonna tell him is that they're gonna put him on the front page of the newspaper and everybody N prison will be waiting 4 him 2 get there. He'll only have 2 choices—they both involve death just who's gonna b the cause of it? I'm not saying this ta try to threaten him, but he's a Topeka Crip. His own people aren't going ta let him walk around.

"He does have legal options tho. We know he was highly intoxicated when he talked to the police. That's called 'voluntary intoxication' and is enough to withdraw his statement mixed wit the fact that he was suicidal at the time of giving the statement. He needs to make his lawyer have a Jackson v. Denno hearing to get his statement withdrawn. Without his statement, the worst they can get him 4 is involuntary manslaughter & he could possibly go home the day of trial. Worst case scenario he'll have to do 32 months & if he withdraws his statement, from the second he steps foot N prison . . . he'll be treated like a God.

21

"He does <u>NOT</u> have to testify against me (5th Amendment to the U.S. Constitution), but if he were to get on stand at my preliminary hearing on 8-18 & just told them that he was upset at me at the time he gave his statement & lied & told them it was me to try ta get me N trouble, that would also allow me to help him N the long run.

"The reason I'm telling this all ta u is because he loves u more than he loves himself. U know he would do whatever u told him ta do. If u were to simply tell him that if he did the right thing & tell them that he lied u would b his chick through his whole prison sentence & you'd have a house 4 him to come home to. And on the other hand, if he were to go down a snitch, you'd never talk ta him again. You know how to work that nigga. U got me?"

The second letter was addressed to Noah Broja. It reads, in relevant part:  "Bro do me a HUGE favor and schedule visits 4 Brandon Croskey 4 as many as u can, under the name DeathB4dishonor. Clog em up so he can't get any. And do it every few days."

Based on the content of these letters, Detective Strathman requested and obtained a search warrant to collect the original letters from Volle's property bag at the jail. Volle filed a pretrial motion to suppress the letters, raising several constitutional arguments—primarily, a violation of his right to privacy under the Fourth Amendment. After considering the parties' written and oral arguments, the district court denied the motion. Over Volle's objection at trial, the district court allowed the State to admit the letters into evidence.

As discussed, the Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. But the Fourth Amendment is not implicated unless the person invoking its protection had a justifiable, reasonable, or legitimate expectation of privacy that was invaded by government action. *Smith v. Maryland*, 442 U.S. 735, 740, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979); see *Illinois v. Caballes*, 543 U.S. 405, 408, 125

S. Ct. 834, 160 L. Ed. 2d 842 (2005) ("Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment.").

Ordinarily, the public at large has a legitimate expectation of privacy in letters and other sealed packages. *United States v. Jacobsen*, 466 U.S. 109, 114, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984). But the Fourth Amendment does not prohibit the examination of prisoners' mail when it is prompted by reasonable justification. *State v. Burnett*, 300 Kan. 419, 442, 329 P.3d 1169 (2014) ("'[B]ecause of their reasonable concern for prison security and inmates' diminished expectations of privacy, prison officials do not violate the constitution when they read inmates' outgoing letters.'"); see *United States v. Gordon*, 168 F.3d 1222, 1228 (10th Cir. 1999) (The regulation of unprivileged incoming and outgoing prison mail by prison officials is typically "an administrative matter in which the courts will not intervene.").

Volle argues the State failed to identify any reasonable justification for monitoring his mail. Specifically, he contends Detective Strathman's request to monitor his mail as a matter of "common practice" in multi-defendant cases was not connected to any legitimate governmental interest. Without a reason for monitoring specific to him, Volle contends the broad and sweeping request to seize all his mail violated his constitutional rights under the Fourth Amendment.

Courts generally assess whether a detainee has a reasonable expectation of privacy in nonprivileged mail by examining the institution's policies. *Burnett*, 300 Kan. at 443-44 (finding defendant had no reasonable expectation that his letters would remain private where defendant knew the jail reserved "'the right to monitor incoming/outgoing mail for threats, escape plots, and other security concerns'"); *State v. Matthews*, 217 Kan. 654, 657-58, 538 P.2d 637 (1975) ("Since the letter was delivered to the jailer unsealed and

with knowledge that it would be read [pursuant to jail policy], defendant has no claim of any invasion of privacy.").

Inmates at the Shawnee County Jail place outgoing mail in a communal box in their living unit. The mailroom staff collects the letters and then sends them out of the building. The inmate handbook—which Volle does not deny he received—provides that all incoming and outgoing mail is subject to search at any time "to protect the safety and security of the recipient, the public, or the staff and inmates of the facility." This policy serves as a reasonable governmental justification for limiting Volle's already diminished privacy interest. Moreover, Detective Strathman articulated an additional public-safety rationale: in cases involving co-defendants, law enforcement monitors inmate mail to prevent improper communications about the case. See *State v. Mason*, 268 Kan. 37, 41, 986 P.2d 387 (1999) ("[P]risoners' outgoing mail may be screened for information on future criminal activities.").

Under these circumstances, Volle lacked any legitimate expectation of privacy in his nonlegal outgoing mail, and the State had a reasonable and specific justification for monitoring it. Accordingly, the district court did not err in denying Volle's motion to suppress the jail-letter evidence.

II. *Aiding and abetting jury instruction*

Volle argues the district court committed reversible error when it sua sponte issued a jury instruction on aiding and abetting.

When analyzing jury instruction issues, appellate courts follow a three-step process: (1) determining whether the appellate court can or should review the issue, in other words, whether there is a lack of jurisdiction or a failure to preserve the issue for

appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether any error requires reversal, in other words, whether the error can be considered harmless. *State v. Holley*, 313 Kan. 249, 253, 485 P.3d 614 (2021); see K.S.A. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict . . . unless the instruction or the failure to give an instruction is clearly erroneous.").

At the first step, Volle objected to the instruction, which preserves the issue for review. At the second step, we consider whether the aiding and abetting instruction was legally and factually appropriate, using an unlimited standard of review of the entire record. See *Holley*, 313 Kan. at 254. Neither party suggests that the instruction was legally deficient in any way, so we assume that the instruction provided an accurate recitation of Kansas' aiding and abetting law. *State v. Broxton*, 311 Kan. 357, 361, 461 P.3d 54 (2020) (To be legally appropriate, the instruction must fairly and accurately state the applicable law.).

Thus, our review at the second step focuses solely on whether the aiding and abetting instruction was factually appropriate. To determine whether an instruction was factually appropriate, we must decide whether there was sufficient evidence, viewed in the light most favorable to the requesting party, to support the instruction. *Holley*, 313 Kan. at 255. Circumstantial evidence is enough to support a conviction of even the gravest offense. In analyzing this issue, appellate courts do not reweigh the evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021).

Though not requested by either party, the district court issued the following jury instruction No. 8 on aiding and abetting:

25

"A person is criminally responsible for a crime committed by another if the person, either before or during its commission, and with the mental culpability required to commit the crime, intentionally aids the other person to commit the crime.

"The person who is responsible for a crime committed by another is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime, if the person could reasonably foresee the other crime as a probable consequence of committing or attempting to commit the intended crime.

"All participants in a crime are equally responsible without regard to the extent of their participation. However, mere association with another person who actually commits the crime or mere presence in the vicinity of the crime is insufficient to make a person criminally responsible for the crime.

"It is not a defense that others who participated in the commission of the crime has or has not been convicted of the crime, any lesser degree of the crime, or some other crime based on the same act."

See K.S.A. 21-5210; PIK Crim. 4th 52.140; PIK Crim. 4th 52.150.

This instruction sets out several related principles of accomplice liability:

(1) A person can be guilty of a crime someone else commits if they knowingly and intentionally help that person commit the crime;

(2) A person who helps commit a crime is also responsible for any other crimes that happen while carrying out or trying to carry out the plan, if those other crimes could reasonably be expected to happen;

26

(3) Everyone who takes part in a crime is equally responsible, no matter how much they were involved. But just being with someone who commits a crime, or simply being nearby, is not enough to make you guilty; and

(4) It is not a defense that the other people involved were convicted of a different crime, a lesser crime, or weren't convicted at all.

If the jury unanimously agreed that Volle should be held responsible for Croskey's criminal acts under these principles of accomplice liability, Volle was criminally responsible for the murder even if he did not fire the shot that killed Shepherd.

K.S.A. 21-5210(a) codifies this theory of liability: "A person is criminally responsible for a crime committed by another if such person, acting with the mental culpability required for the commission thereof, advises, hires, counsels or procures the other to commit the crime or intentionally aids the other in committing the conduct constituting the crime." But mere association with a bad actor cannot establish guilt through accomplice liability. *State v. Llamas*, 298 Kan. 246, 253, 311 P.3d 399 (2013). "'[T]o be guilty of aiding and abetting a defendant must willfully and knowingly associate himself with the unlawful venture and willfully participate in it as he would in something he wishes to bring about or to make succeed.'" *Llamas*, 298 Kan. at 253; see *State v. Simmons*, 282 Kan. 728, 737-39, 148 P.3d 525 (2006) (witnesses who did not participate in robbery were not accomplices; their mere presence during the planning stages and receipt of stolen goods as incentives for their silence did not make them liable).

An aiding-and-abetting instruction is factually appropriate if, based on the totality of the evidence, the jury could reasonably conclude that the defendant aided and abetted another in the commission of the crime. *State v. Shields*, 315 Kan. 814, 835, 511 P.3d 931

27

(2022). Volle argues that the aiding and abetting instruction was not factually appropriate because there was no evidence that he and Croskey acted together to shoot Shepherd. Volle notes that he and Croskey presented conflicting testimony, each blaming the other for the shooting and claiming they were unaware that the other person had a firearm or was planning to use it to shoot Shepherd.

But Volle's argument seeks to narrow the scope of accomplice liability to the act of the shooting itself and ignores evidence of his actions both before and after the shooting. Viewed in a light most favorable to the State (as the appellate party arguing in favor of the instruction), sufficient evidence could support a jury's finding that Volle willfully and knowingly associated with and participated in a criminal venture beyond mere association. The State presented evidence that Croskey wanted to fight Shepherd and contacted Volle to be his backup. Volle willingly got into Croskey's Trailblazer and accompanied him to follow Shepherd. During this pursuit, Volle's gun was used to fire a gunshot from the Trailblazer, killing Shepherd. After the shooting, Volle and Croskey went to Volle's house, where they talked about the shooting and Volle wiped fingerprints from the gun and discussed how to sell or destroy it. Volle never contacted the police to report the shooting and told Croskey to leave him out of it if he decided to report it.

Thus, even if the jury could not agree on who fired the fatal shot, sufficient evidence could support a jury's finding that Volle aided and abetted Croskey in the killing. See *State v. Blevins*, 313 Kan. 413, 428, 485 P.3d 1175 (2021) (conflicting evidence creating ambiguity as to which party pulled the trigger rendered aiding and abetting instruction factually appropriate); *Llamas*, 298 Kan. at 254 ("The requisite intent to aid and abet the inherently dangerous felony may be inferred from circumstantial evidence."). As a result, the aiding and abetting instruction was factually appropriate. Because the instruction was both legally and factually appropriate, the district court did not err in giving it.

III. *Cumulative error*

Volle argues that the cumulative effect of the errors alleged above warrants reversal of his convictions.

Cumulative trial errors, when considered together, may require reversal of the defendant's convictions when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. *State v. Alfaro-Valleda*, 314 Kan. 526, 551, 502 P.3d 66 (2022). But the cumulative error rule does not apply when, as here, there are no errors. See *State v. Lowry*, 317 Kan. 89, 100, 524 P.3d 416 (2023).

IV. *Sufficiency of the evidence*

Next, Volle challenges the sufficiency of the evidence supporting his conviction for first-degree felony murder.

"'When the sufficiency of the evidence is challenged in a criminal case, we review the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses.'" *Aguirre*, 313 Kan. at 209.

K.S.A. 21-5402(a)(2) defines felony murder as "the killing of a human being committed . . . in the commission of, attempt to commit, or flight from any inherently dangerous felony." Criminal discharge of a firearm at an occupied motor vehicle is included in the statutory list of inherently dangerous felonies. See K.S.A. 21-5402(c)(1)(O); K.S.A. 21-6308(a)(1)(B).

29

Consistent with this statutory definition and the principles of accomplice liability previously discussed, the district court instructed the jury that to find Volle guilty of felony murder, the State had to prove that (1) Volle or another for whose conduct he is criminally responsible killed Shepherd and (2) the killing occurred while Volle or another for whose conduct he is criminally responsible was committing criminal discharge of a firearm at an occupied vehicle. The court also instructed the jury that to establish the crime of criminal discharge of a firearm at an occupied vehicle, the State was required to prove, in relevant part:

> "1. Mr. Volle or another for whose conduct he is criminally responsible discharged a firearm at an occupied vehicle.
>
> "2. Mr. Volle or another for whose conduct he is criminally responsible did so recklessly and without authority.
>
> "3. The vehicle was occupied by a human being at the time, whether or not Mr. Volle or another for whose conduct he is criminally responsible knew or had reason to know it was occupied."

See K.S.A. 21-6308(a)(1)(B).

Volle argues that the evidence is insufficient to support his conviction for first-degree felony murder because the State failed to prove the predicate offense it alleged to support his felony-murder conviction—criminal discharge of a firearm at an occupied motor vehicle. Volle claims the evidence showed that he shot only at Shepherd, not at a vehicle.

This court rejected the same argument in *State v. Farmer*, 285 Kan. 541, 175 P.3d 221 (2008), and recently affirmed that decision in *State v. Levy*, 313 Kan. 232, 485 P.3d 605 (2021).

In *Farmer*, the defendant walked up to a vehicle window and shot the driver multiple times both at close range and while backing away from the vehicle. He was convicted of criminal discharge of a firearm at an occupied vehicle and felony murder. On appeal, the defendant argued the evidence was insufficient to prove criminal discharge of a firearm at an occupied vehicle because the evidence showed he fired at the person in the vehicle, and not at the vehicle. 285 Kan. at 544-45.

A majority of this court rejected the argument, holding that the prior version of the criminal discharge statute did not require the State to prove that the shooter intended to shoot the vehicle or building:

"The statute was designed to cover situations where there are difficulties in proving the shooter's intent. According to Farmer's, and the dissent's, interpretation of the criminal discharge statute, there *cannot be any* evidence of intent to shoot at anything other than the occupied vehicle or building itself. In other words, there must be a complete absence of intent to hit an occupant of an occupied vehicle or building for the statute to apply. Such a construction eviscerates the criminal discharge statute by putting the focus right back on the shooter's intent, thus making it unavailable in the very situations it was designed to cover—situations where proof of intent to injure or kill is problematic." *Farmer*, 285 Kan. at 546-47.

In dissent, Justice Beier concluded that the phrase "'at [a] . . . motor vehicle'" was not ambiguous and required proof of a specific intent to shoot at the vehicle rather than some other target. 285 Kan. at 556 (Beier, J., concurring in part and dissenting in part)

("[T]here is zero evidence that Farmer shot *at* the vehicle in which DeAundrey Neal happened to be sitting rather than *at* Neal himself.").

In *Levy*, the defendant exchanged gunfire with a rival gang, which resulted in the shooting death of an innocent victim in a nearby truck. 313 Kan. at 232-33. Relying on Justice Beier's analysis in the *Farmer* dissent, the defendant challenged his felony-murder conviction by claiming the evidence was insufficient to support the predicate crime of criminal discharge of a firearm at an occupied vehicle because the evidence showed only that he intended to fire at a rival gang member, not at an occupied vehicle. 313 Kan. at 234-35. This court declined the defendant's invitation to revisit its decision in *Farmer*:

> "In Kansas, the crime of criminal discharge does not require a specific intent to shoot 'at a motor vehicle' as opposed to at some other target—whether that target is inside the vehicle, hiding behind the vehicle, or only nearby the vehicle. This conclusion is further supported by the legislative amendments to the criminal discharge statute altering the necessary state of mind to 'reckless.' Compare K.S.A. 2006 Supp. 21-4219(b) (criminalizing 'the malicious, intentional and unauthorized discharge of a firearm') with K.S.A. 2020 Supp. 21-6308(a)(1)(b) (changing the mens rea to 'reckless'). Putting all this together, a person has committed the crime of criminal discharge under K.S.A. 2020 Supp. 21-6308(a)(1)(B) if: (1) that person recklessly and without authorization discharges a firearm; (2) that discharge was 'at a motor vehicle' independent of the shooter's intended target; and (3) a person was inside the vehicle." *Levy*, 313 Kan. at 236.

Volle acknowledges this court's precedent in *Farmer* and *Levy* but disagrees with the analysis in those cases, claiming it is contrary to the plain language of K.S.A. 21-6308(a)(1)(B)—which requires that the firearm be discharged at an occupied vehicle—and renders the phrase "at a motor vehicle" meaningless. He argues these cases were wrongly decided because they focus on the shooter's intent rather than the shooter's actions. Citing evidence in the record that the gun was only fired when its laser was positioned on Shepherd and that no bullets hit Shepherd's car, Volle claims he did not

32

violate the statute because he did not fire at an occupied vehicle. Given the ambiguity of K.S.A. 21-6308(a)(1)(B), Volle suggests the rule of lenity requires the statute to be construed in his favor.

Volle offers no compelling reason to deviate from our prior rulings in *Farmer* and *Levy*. These decisions are not in conflict with K.S.A. 21-6308(a)(1)(B)'s plain language, they do not render the phrase "at a motor vehicle" meaningless, and they do not focus on the shooter's intent. To the contrary, *Farmer* and *Levy* both discussed how the criminal discharge statute removed the focus from the shooter's intent. See *Farmer*, 285 Kan. at 546 ("The statute was designed to cover situations where there are difficulties in proving the shooter's intent."); *Levy*, 313 Kan. at 236 (discussing legislative amendments to the criminal discharge statute altering the necessary state of mind to "reckless").

As discussed, to prove the offense of criminal discharge of a firearm at an occupied motor vehicle, the State was required to prove that Volle (or another whose conduct he was criminally responsible for): (1) recklessly discharged a firearm (2) at a motor vehicle (3) with a person inside. See K.S.A. 21-6308(a)(1)(B); *Levy*, 313 Kan. at 236. The evidence presented at trial established that Shepherd was standing inside the open driver's side door of his car when he was shot and that Megan was inside the car. Although the shot did not hit the car, it need not do so to meet the elements of the crime and does not negate the fact that the shot was fired at a motor vehicle occupied by Megan. Viewing the evidence in the light most favorable to the State, a rational factfinder could find Volle guilty beyond a reasonable doubt of the crime of criminal discharge of a firearm at an occupied motor vehicle. As a result, the evidence was sufficient to support Volle's felony-murder conviction.

V. *Sentencing*

Finally, Volle contends the district court erred when it sentenced him for his felony-murder conviction because his conviction for reckless second-degree murder was more specific and therefore should control his sentence under K.S.A. 21-5109(d).

Resolving this issue requires statutory interpretation, which presents a question of law over which appellate courts have unlimited review. *State v. Betts*, 316 Kan. 191, 197, 514 P.3d 341 (2022). When interpreting a statute, an appellate court must first attempt to give effect to the intent of the Legislature through the statutory language enacted, giving common words their ordinary meanings. When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. *State v. Keys*, 315 Kan. 690, 698, 510 P.3d 706 (2022).

K.S.A. 21-5109(a) provides that a defendant may be charged with multiple crimes stemming from the same conduct in different counts within a single complaint. But when the crimes alleged "differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct," the defendant can be convicted only of one of the crimes and must be sentenced "according to the terms of the more specific crime." K.S.A. 21-5109(d).

Here, the jury found Volle guilty of felony murder and the alternative lesser included offense of reckless second-degree murder. Felony murder is "the killing of a human being committed . . . in the commission of, attempt to commit, or flight from any inherently dangerous felony." K.S.A. 21-5402(a)(2). Reckless second-degree murder is "the killing of a human being committed . . . unintentionally but recklessly under

34

circumstances manifesting extreme indifference to the value of human life." K.S.A. 21-5403(a)(2).

Volle suggests that because his convictions for the two crimes were based on the same conduct, reckless second-degree murder criminalizes more specific conduct since it requires a mental state of recklessness, while felony murder does not require a culpable mental state.

Volle's argument misinterprets K.S.A. 21-5109(d). Although the same conduct may support both felony murder and reckless second-degree murder, as it did here, the felony-murder and reckless second-degree murder statutes are aimed at preventing different conduct and require different elements of proof and different levels of mental culpability. While both involve an unintentional killing, felony murder "requires proof the defendant engaged in dangerous, felonious conduct and that a death occurred as a result of that conduct." *State v. Patterson*, 311 Kan. 59, 67, 455 P.3d 792 (2020); see K.S.A. 21-5402(a)(2) (felony murder requires proof of inherently dangerous felony). By contrast, reckless second-degree murder does not require a defendant to engage in dangerous, felonious conduct. Rather, the unintentional killing is borne out of *reckless* conduct. *State v. Deal*, 293 Kan. 872, 883-84, 269 P.3d 1282 (2012); see K.S.A. 21-5202(j) ("A person acts 'recklessly' or is 'reckless,' when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation."); *State v. Johnson*, 304 Kan. 924, Syl. ¶ 5, 376 P.3d 70 (2016) (Reckless second-degree murder is not purposeful, willful, or knowing, but results from an act performed with knowledge that the victim is in imminent danger, although death is not foreseen.). In sum, neither crime is more general nor more specific than the other because each targets a different theory of liability. Because the reckless second-degree murder statute does not punish a more specific

instance of conduct generally prohibited by the felony-murder statute, K.S.A. 21-5109(d) does not apply to Volle's convictions.

Moreover, although not discussed by either party, we find the district court correctly sentenced Volle for felony murder based on Kansas' rules governing convictions and sentencing for alternative charges. A defendant charged in the alternative may be convicted of only one of the alternative offenses. *State v. Garza*, 290 Kan. 1021, Syl. ¶ 5, 236 P.3d 501 (2010). When a jury returns guilty verdicts on two alternatively charged counts, the doctrine of merger applies, and the district court must accept only the verdict as to the greater charge. *State v. Vargas*, 313 Kan. 866, 873, 492 P.3d 412 (2021).

The jury returned a verdict finding Volle guilty of both first-degree felony murder and reckless second-degree murder—a lesser included offense of first-degree premeditated murder, which the State had charged in the alternative. At sentencing, the district court merged the murder convictions into a single conviction for first-degree felony murder and sentenced Volle for that crime. Reckless second-degree murder is a severity level 2, person felony. K.S.A. 21-5403(b)(2). First-degree murder is an off-grid felony. K.S.A. 21-5402(b). Accordingly, the district court correctly applied the doctrine of merger and sentenced Volle on the greater charge of felony murder.

Finally, we acknowledge Volle's submission under Supreme Court Rule 6.09(b) (2025 Kan. S. Ct. R. at 41) directing our attention to *State v. Johnson*, 321 Kan. ___, 2025 WL 3289978 (2025). Contrary to Volle's claim, *Johnson*'s interpretation of K.S.A. 21-5109(d) aligns with—and confirms—the analysis and outcome we reach in this case.

The judgment of the district court is affirmed.